The FIRESTONE TIRE & RUBBER COMPANY and GoCorp, Inc.

v.

The UNITED STATES.

No. 208–74.

United States Court of Claims.

June 15, 1977.

Before COWEN, Senior Judge, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiffs' request for review by the court of the recommended decision of Trial Judge George Willi, filed September 24, 1976, pursuant to Rule 166(c) on plaintiffs' motion and defendant's cross-motion for summary judgment, having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. It is, therefore, concluded that plaintiffs are not entitled to recover and, accordingly, plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiffs' petition is dismissed.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge:

This is a suit for Wunderlich Act[1] review of a decision[2] of the Armed Services Board of Contract Appeals (the Board) denying plaintiffs recovery of excess costs allegedly incurred by them in performing similar supply contracts for a track component (a so-called "shoe") that is a part of the running gear of M–113 Armored Personnel Carriers. The common predicate of plaintiffs' assorted contentions here is the claim that the Board failed to correctly and completely apprehend and apply the evidence that was before it.[3] In that vein it is said that the

Loren K. Olson, Washington, D. C., attorney of record, for plaintiffs. Nelson L. Bain, Thomas J. Doherty and Morgan, Lewis & Bockius, Washington, D. C., of counsel.

Julie P. Dubick, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

1. 41 U.S.C. §§ 321–22 (1970).

2. *Firestone Industrial Rubber Products Co. and GoCorp, Inc.*, 74–1 BCA ¶ 10,516.

3. At the outset of their main brief plaintiffs identify the thrust of their grievance with the Board action as follows:

In what must be considered a classic example of a failure to read, consider and understand the record before it, the Board has rendered herein a decision which truly meets the descriptive language of section one of the Wun-

derlich Act, in that such decision to the extent it addressed factual matters is arbitrary, capricious, so grossly erroneous as to raise the implication of bad faith, and is not supported by substantial evidence.

Both the intensity and the factually oriented character of plaintiffs' attack remained unchanged in their reply brief. There it is charged:

* * * If the record is selectively edited, and the massive documentary evidence to the contrary of the Board's finding is summarily

Board improperly failed to find (1) that the contract specifications were defective in a particular that rendered performance commercially impossible, (2) that at pre-bid conferences Government representatives made certain material misrepresentations on which plaintiffs relied to their ultimate detriment, and (3) that the Government improperly withheld from bidders specific know-how for producing the articles contracted for.

Although defendant has candidly acknowledged on brief that in certain isolated instances the Board decision was factually inaccurate, it insists that the record amply supports all of the ultimate determinations controlling liability. As will be shown, a thorough examination of the entire record on this review confirms that view.

Preliminarily it is important to note that in announcing the now-settled principle that the validity of an administrative body's decision must be judged by the grounds on which the body based its action, the Court expressly emphasized that its holding not be taken as a renunciation of or any encroachment on the antecedent doctrine that a reviewing court should affirm the decision below if supported by facts implicit in the record on which that decision was rendered. *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87–88, 93, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The body of uncontradicted evidence in the present record—evidence consisting largely of the testimony of plaintiffs' own witnesses—convincingly demonstrates that the latter principle governs this case.

The article involved in this litigation is the rubber-padded, steel shoe that when interlocked in series by steel pins form the two belt-like tracks on which the M–113 moves along the ground under power supplied by drive sprockets that engage slots

provided in each shoe. The general configuration of the shoe is as shown in the following illustration which views the underside (the side that contacts the ground) of a shoe to which rubber has not yet been applied.

[Rubber-padded, steel shoe illustration referred to on preceding page]

The shoe is approximately 8 inches long and 15 inches wide, the leading edge having the three hinge-like protrusions and the trailing edge two. As can be visualized from the illustration, the protrusions (called "bosses") are positioned so that the leading edge of one shoe will mesh with the trailing edge of another. A 1¼ inch hole is drilled through the center of each of the bosses on a line perpendicular to the intended line of

___

ignored, then there may exist a possibility that the Board's decision is based on the record that the Board considered. Quite obviously, however, this is not the test the Court has promulgated for the review of administrative decisions under the Wunderlich Act. Under the proper standard, there is a duty upon the Board to examine the entire record and to render findings based upon substantial evidence of the

record considered as a whole. *Koppers Company, Inc. v. United States*, 405 F.2d 554, 186 Ct.Cl. 142 (1968). This the Board failed to do. Plaintiffs' reply brief concludes:

\* \* \* The [Board] decision represents such a fundamental failure by the Board to read, consider and understand the record before it, that plaintiffs must question the motives upon which it was based \* \* \*.

travel so that when two shoes are mated they may be held together by a single pin passing through the channel that is formed by alignment of the five boss area holes. It is difficulties encountered by plaintiffs in drilling those holes that occasioned the excess production costs for which they sue.

By 1968, when the contracts in issue were let, the M–113 vehicle, developed for the Army by the FMC Corporation, had been in field service since 1960. From the beginning, the material specifications for the track shoes authorized the use of any one of six different types of steel, each identified by the standard classification number assigned by the American Iron and Steel Institute (A.I.S.I.). These alternatives included A.I.S.I. numbers 1345H, 4140H, 4145H, 5145H, 6150H and 8645H. Initially 5145H was used and gave an acceptable track life. Suppliers soon discovered, however, that a shoe could be produced at a lower cost by using 1345H steel and by 1963 that became their invariable choice.

Government procurement of track shoes, a volume item, was accomplished by an invitation for bid and subsequent award to the lowest responsible bidder. Competition for this business was keen. As a GoCorp executive testified, the prime contractor was typically a major rubber company such as Firestone or Goodyear because they had both the technology and facilities to perform the essential rubberizing operation, and the kind of financial strength that appealed to the three categories of subcontractors who were ordinarily involved in making the metal component of the shoe. The first step in the production cycle that evolved under industry practice was the forging of the overall configuration of the shoe. This was done by a forging subcontractor who typically operated with steel that the prime had purchased from a mill. The shoe forging was then sent to another subcontractor for heat treating. First the entire shoe was brought to a Rockwell hardness in the range of 25–35. Then various portions of it were further hardened. The areas where selective heat treatment was critically important where the sprocket openings and the grousers, the peripheral

ridges that served both to stabilize the rubber pad to be later applied to the underside of the shoe and as a weight-bearing surface after that rubber had worn down from usage. Next the shoe went to a machining subcontractor such as GoCorp, whose primary business was the manufacture of production equipment for the cement block-making industry. The principal machining operation performed was the drilling of the 1¼ inch holes through the bosses. The ends of those holes were also beveled (chamfered) and, as indicated in the illustration, *supra*, a relatively small hole was drilled through the center of the body of the shoe so that a rubber pad could be bolted to the underside of it. The final phase of production involved the application of rubber to the shoe.

As volume increased in the midsixties in response to expanded military needs, a significant decrease in track life, resulting from extensive cracking in the steel, especially around the grousers and the sprocket openings, was reported from the field. In 1965 the Army initiated investigations and research aimed at finding a solution to these problems. Those efforts continued through 1967. Meanwhile, under a co-production agreement with the United States, Italy (by the joint efforts of Fiat as the prime and Pirelli as the rubberizing subcontractor operating under a 1963 license from Firestone) had begun producing shoes for the M–113 under the same drawings and specifications to which the United States suppliers were subject. Early test results on those shoes revealed a substantially longer useful life than that obtained from domestic production. The Army consequently undertook an in-depth investigation to identify the reasons for these markedly different operating performances.

Even though Italian and domestic shoes were produced under the same contract requirements, investigation disclosed four major differences in the materials and methods employed. First, the Italians opted to use the metallurgical equivalent of our 4140H steel rather than the cheaper 1345H used by all domestic producers. That steel

(4140H) has a somewhat lower carbon content, which makes it less susceptible to cracking from the hardening process, and it contains some chromium and molybdenum, not present in 1345H, that make it a tougher steel with a deeper hardenability. Second, the Italians normalized after forging. That additional heating operation accomplishes some stress relief but more importantly tends to make steel more homogeneous by eliminating the very hard and brittle particles known as cementite, a combination of carbon and iron. Third, the Italians used much more stringent in-process quality-control procedures than required by the contract specifications. Such measures included a magnaflux inspection of all finished shoes. Finally, the Italians built their shoe to the upper end of the dimensional tolerances permitted by the contract drawings whereas the domestic producers uniformly strove for the minimum acceptable dimensions. This meant that the Italian shoe typically contained at least 1 pound more steel than its United States counterpart.

When the United States investigators magnafluxed a large sampling of new domestic shoes they found that 70–90 percent of them contained cracks before ever being put into service. This suggested that a more stringent culling for latent defects was one of the keys to the superior field performance achieved by the Italians.

While the investigators recognized that the Italian shoe was more costly to produce (according to exhibits introduced by plaintiffs the price paid for those shoes was approximately $3 per shoe more than domestic-source production), they concluded that the difference in initial cost was more than offset by the operating economies resulting from increased useful life.

By the end of 1967 the Army reached the definite conclusion that the contract specifications for future procurement should be modified to the extent necessary to make domestic production practices more closely conform to those employed by the Italians. This was first undertaken in an Invitation For Bids issued January 25, 1968. That Invitation (I.F.B. 0750) differed from previous ones in several respects. All steel options other than 4140H were eliminated. The requirement of normalizing after forging was made explicit. Radiographic inspection of forgings was required, as was magnaflux inspection of all finished shoes. In addition, the Supplemental Quality Assurance Provisions (known as SQUAPs) were materially expanded to impose much stricter in-process inspection and quality-control procedures. The departures represented by these features, particularly those relating to inspection and quality control, caused industry representatives to request a pre-bid conference.

As matters developed, two pre-bid conferences were held; the first on January 29, 1968, and the second on March 14, 1968.

As confirmed by plaintiffs' own witnesses, discussion at the bidders' conferences focused primarily on the newly-added inspection and quality-control requirements. As to the cost of compliance, Government representatives acknowledge their awareness that greater cost was entailed and volunteered their expectation that the Army would have to pay more [4] for an improved product that had a significantly greater useful life. As a result of these discussions and at the behest of industry members, the new SQUAPs were modified to some extent but were not materially altered.

It is undisputed that at some point in one of the bidders' conferences the nge-like protrusions and the trailing edge two. As can be industry participants asked the Government's representatives how 1345H and the newly-mandated 4140H steel compared in machinability. The response given was that they were essentially similar. To substantiate that view the Government people referred the industry conferees to the Machining Data Handbook, a research publica-

---

4. As a reference point for comparative pricing purposes, the next preceding procurement (the last permitting use of 1345 steel) was a con-

tract awarded Firestone August 9, 1967, for 600,000 shoes at $13.20 each.

tion compiled for Army Ordnance by a private firm. That publication, the relevant portions of which were placed in evidence, lists 1345 and 4140, when of equal hardness, in the same performance category insofar as machining is concerned. The preface of that publication, under the heading PURPOSE, includes the following caveat: "It should be emphasized that these data, while realistic and helpful in eliminating considerable duplication of effort, are not intended to replace the many detailed studies and work required to totally optimize specific machining situations."

Following the above conferences Firestone submitted a bid of $14.97 per shoe in response to Invitation 0750. The contract, for 355,584 shoes, was awarded a long-standing competitor, Standard Products Company, for $13.798 per shoe. Although that contract is not directly involved in the present controversy, it bears some relationship; first because both plaintiffs point to the performance difficulties encountered by Standard as corroborative of their contentions respecting the causes of the problems that they later experienced in performing their own contracts and, second, because on Standard's contract plaintiff GoCorp served, as it had on all previous occasions since 1964, as its machining subcontractor. In this proceeding plaintiffs called as one of their witnesses a Mr. Cook, the Standard official responsible for track shoe production, to testify concerning that firm's performance difficulties—difficulties that centered on GoCorp's problems in drilling the boss holes in forgings made from 4140H steel. Explaining that Standard utilized Federal Drop Forge as its forging and heat-treating subcontractor, Mr. Cook testified that as soon as GoCorp received the first shoes from Federal it reported to him that it could not satisfactorily machine them. This, according to Mr. Cook, would have been approximately in July 1968, there having been an initial delay of 4 to 6 weeks in obtaining forged and heat-treated shoes be-

cause at first Federal experienced a breakage problem with the dies that it used to forge the 4140H steel. Federal managed to overcome the problem in about a month and Standard's delivery schedule was adjusted accordingly by the Government without penalty.

Mr. Cook testified that as soon as GoCorp reported the excessive drill breakage and high incidence of out-of-round holes that apparently resulted from the irregular hardness of the steel in the boss areas he instituted a program for testing the effects of various methods of heat treatment. Basically, the idea was to observe the results of bringing the shoes to differing degrees of Rockwell hardness throughout the entire range of the hardness tolerances authorized by the specifications and also to test the effect of increasing the length of time that a shoe was held at a given temperature in the heat-treating furnace. As a result of this experimentation Standard found that by holding the Rockwell hardness of the shoes to essentially the minimum permitted by the specifications and by substantially increasing the dwell or soak time in the heat-treating furnace it could obtain a shoe of acceptable machinability. The time required for the trial and error testing that led to these discoveries, together with the initial delay in obtaining forgings from Federal accounted for an overall delay in contract completion time of approximately 14 months. Time extensions without penalty were allowed by the Government to cover the entire period of delay.

After award of the above contract to Standard the next procurement utilizing the revised specifications, including the mandatory use of 4140H steel, was initiated by an I.F.B. issued May 10, 1968, soliciting bids for some 900,000 shoes. Whereas Firestone had bid $14.97 on the prior contract that was awarded Standard at $13.798, this time it bid $13.347 including provisions for discounts that had the potential of reducing that figure to a net of $13.08 per shoe.[5] On

5. Since it was generally recognized that this was a higher cost shoe than the earlier version, it is significant to note that on a net basis

plaintiff bid 12 cents a shoe less than the price of its last contract using 1345 steel, n. 4, *supra*. That the bid could have been so low in the face

a net basis Firestone was low bidder and on July 3, 1968, it was awarded a contract for 938,184 shoes. It is that contract on which Firestone has brought the present suit.

To perform its contract (DAAE07–69–C–0017) Firestone engaged a forging subcontractor who purchased the steel and forged it. It also associated GoCorp as a subcontractor. Whereas previously the only heat treating done by GoCorp was the selective hardening of the grouser and sprocket hole areas, this time it undertook to perform the preliminary heat treatment of the entire shoe, i. e., the treatment required to bring the shoe within the specification tolerance of 25–35 degrees of Rockwell hardness. Firestone supplied GoCorp the technology to perform this operation and it is undisputed that the technology so furnished was that which had been used to heat treat 1345 steel. Firestone also utilized seven other firms, primarily American Steel Treat, Commonwealth and G & W Engineering, as heat-treating subcontractors and no evidence was adduced indicating that any of them proceeded otherwise than by applying to the 4140 steel the same technology and procedures that they had used to heat treat the 1345.

According to the testimony of James B. Ringle, who joined GoCorp on July 5, 1968, as its controller and later became vice president in charge of track shoe manufacturing, GoCorp encountered problems "right from the beginning" when it attempted to drill the boss area holes in the 4140 forgings with which it worked as Firestone's sole machining subcontractor under the latter's 0017 prime contract.[6] He defined "the beginning" as the period September-October 1968. The drilling problems were the same as previously described in respect to Standard's contract. Mr. Ringle related that

GoCorp concluded that the source of its difficulties related to either the heat treatment or the chemistry of the steel because machinability varied radically from shoe to shoe; some shoes machining satisfactorily while others caused drill breakage and produced out-of-round holes. He added that despite this belief GoCorp expended much time and effort on various unsuccessful attempts to surmount the problem by changing its drilling equipment and technique. He explained that ultimately the drilling difficulties were overcome by segregating the forgings for heat-treating purposes according to the heat from which the steel came from the mill, a "heat" being an individual production batch from the mill. He further explained that the chemistry of each batch of the same A.I.S.I. type of steel produced at a mill is somewhat unique and the batch is identified accordingly by the mill. According to Mr. Ringle, it was necessary to adapt heat-treatment procedures to the particular chemistry of the forgings involved. Uniformity of that chemistry among the shoes with with the heat-treating furnace was charged was obtained by segregating the forgings according to steel mill heat or batch from which the forgings were made. When this was done, uniform machinability resulted.

Despite the difficulties that GoCorp had first experienced as the machining subcontractor for Standard and again in the same capacity for Firestone, in mid-December 1968, it entered its own bid in response to an I.F.B. calling for approximately 195,000 shoes to be made according to the same specifications that were involved in the Standard and Firestone contracts. GoCorp was eligible for "set aside" as a small business and Contract No. DAAEO7–69–C–2745

---

of contrary cost considerations was explained by the testimony of the Manager of Firestone's Government Contracts Division in terms of a general company policy under which the reference point for bid pricing purposes is the prior successful bid, in this case Standard's bid of $13.798 on the initial procurement.

**6.** Although Mr. Ringle, the only officer or employee of GoCorp who testified on its behalf in the Board proceeding, referred only to the drill-

ing problems encountered by that concern in working with 4140 steel, according to testimony given later in the proceeding by a Firestone employee, GoCorp also experienced a severe cracking problem in the grouser and sprocket window areas when it attempted to use on the 4140 shoes the same induction hardening procedures that it had applied without adverse results to shoes forged from 1345 steel.

was awarded it February 27, 1969, on a negotiated basis at a price of $13.295 per shoe.

Wayne J. Hilton testified that in late 1968 or early 1969, when he was a project engineer for Firestone with a background in mechanical and electrical engineering, the Manager of Firestone's Industrial Products Division sent him to GoCorp's plant to assist in solving the problems that were hindering performance of the latter's subcontract responsibilities under the Firestone prime contract. When he arrived he found that GoCorp was having problems with (1) excessive cracking, (2) drilling the boss areas and (3) heat treatment. According to his testimony, he concentrated on the first two of these problems, presumably leaving the third to a Firestone metallurgist (since deceased) who was already on hand. Mr. Hilton explained that GoCorp's use on the 4140 shoe of the same induction hardening techniques that it had employed on 1345 shoes resulted in extensive cracking the grouser and sprocket window areas. This was alleviated by more precisely locating the electromagnetic induction coils around the areas to be heated; immersing in the liquid quench only those areas to be hardened, rather than submerging the entire shoe in the quench solution; and, stress relieving the shoe after these operations by placing it in a normalizing oven at 400 degrees. Mr. Hilton, who was not a metallurgist, attacked the boss area drilling problems from the standpoint of drilling equipment and technique. Substantial experimentation was conducted with respect to many different types of drill bits, different formulations and applications of liquid coolants, different rates of speed, feed and r. p. m. Mr. Hilton testified that these measures combined to increase drilling efficiency but did not improve it sufficiently to become commercially acceptable.

Finally, in May 1969, Mr. Egbert H. Drewes, a senior metallurgist with Firestone, was sent to the GoCorp plant to resolve the drilling problems that persisted despite the efforts of Mr. Hilton, as previously described. The following colloquy on Mr. Drewes' direct examination, describes the situation that obtained at the time of his arrival on the scene:

Q. What was the nature of the machining problems as you observed them at that time in GoCorp?

A. They were having a very short drill life. The drills were frequently freezing in the drilling, and the drills would actually snap at different locations up and down the shank of the thing. Sometimes they would chip; maybe the size of a dime would break off the cutting edge. Actually this was caused by welding of the boss material to the cutting edge of the drill.

They also had some problem with egg-shaped holes, out of round holes. This appeared to be caused by the fact that you have two cutting edges on your drill, and sometimes this 4140 material would weld onto one of the cutting edges and chip off. The cutting edge was no longer effective, and you were cutting with one side, and would cut an egg-shaped hole. Sometimes the drill would travel at an angle to the point where the drill could break for that reason.

Q. Were these shoes scrapped?

A. Absolutely. There was nothing you could do with those.

Q. Was there anything unusual about the type of machining problems you observed?

A. Yes, there was. The welding of the material to the cutting edge was unusual. This commonly happens on real soft, gummy material such as low carbon annealed steels where the material is real soft. They will weld to the cutting edge of the tool. When you get into quenched and tempered materials such as we were working with, you might expect more wear on the cutting edge of the drill, *but you certainly won't expect this welding that we were observing on there.* [Emphasis added.]

\* \* \* \* \* \*

Mr. Drewes was the witness through whom plaintiffs advanced their basic contention that the Government's insistence on

the use of 4140 steel rendered performance of their supply contracts commercially impossible under the technology that existed at the time that those contracts were awarded.

To support his thesis Mr. Drewes first referred to the relative Jominy Hardenability Bands of 1345 and 4140 steels as charted in a published handbook of the American Iron and Steel Institute. A comparison of these charts, Mr. Drewes testified, showed that although 1345 had a somewhat greater surface hardenability, owing to its greater carbon content, and 4140 a deeper hardenability, the differences between the two were so narrow as to suggest that the same heat-treating procedures could be used for both of them without a significant difference in results. He then referred to the Machining Data Handbook of the Metcut Research Associates Inc. as indicating that at the same level of hardenability 1345 and 4140 would machine similarly. Finally, on these bases Mr. Drewes opined that there was nothing readily available in the body of technical literature extant in 1968 that would lead one to believe that he would encounter machining problems with 4140 steel if it had been heat treated in the same manner as had been successfully used for heat treating 1345 steel.

Mr. Drewes went on to explain that his investigation of the machining problem led him scientifically to examine cross-sections of the boss areas of fully heat treated 1345 and 4140 in order to compare the microstructures of each. The specimens were then analyzed to determine the relative hardness of their respective microstructures. Testifying that the microconstituents of steel tend to segregate in band form when the original ingot forms and tend to recur in subsequent heat treatment unless that treatment is specifically designed to prevent or inhibit that recurrence, Mr. Drewes explained that the machining problems were caused by the segregation or banding of the chromium and molybdenum alloys formulated into 4140 steel to increase toughness but not present in 1345, which is a manganese steel. The very hard bands of segregated chromium and molybdenum, separated by bands of softer microconstituents, called pearlite, presented the drill bit with an uneven field in which to work. In Mr. Drewes' words: "What we determined in our investigation was happening, as the cutting edge of the drill passed through the harder layer, there was a frictional heat developed at the edge of the drill, and then when it passed through your softer layers, they were actually welded to the cutting edge of the drill. It caused very rapid breakdown of the drill and was a major cause of our machining problems."

Mr. Drewes' explanation of the means by which plaintiffs overcame the microconstituent segregation that caused the machining problems totally refutes their contention that technical knowledge available in 1968 was not such as to have warned them that 4140 steel cannot be successfully heat treated with the same procedures used for 1345.

Mr. Drewes referred to one of a series of diagrams contained in a publication of the United States Steel Corporation showing steel users the different microstructures that they can expect in various types of steel, depending upon the rate and temperatures at which they are cooled. He then explained[7] that these data show that un-

7. Specifically, Mr. Drewes testified:

THE WITNESS: At approximately 900° F. there is a nose of a curve that progresses from left to right. This is commonly called the nose of the curve in metallurgical terminology. With that as an explanation, to get a thorough hardening or complete quench when cooling from the austetizing range *you have to [re]move the heat rapidly enough to miss the nose of this curve. When heat treating the 4140H with the procedures developed for 1345, we did not miss the nose of the curve.* The cooling line entered into the right side of the curve, and when this occur[r]s, a lower hardness microconstituents form at that time. On the 4140H these lower hardness microconstituents such as ferrite and pearlite form along the inherent banding line. The residual effect of segregation in the ingot. Then as cooling continues the remainder of the microstructure will transform to martensite or the hard microconstituent. This also forms back along the inherent banding line, the intermediate banding line between softer microconstituents which

\* \* \* \* \* \*

less, in the quenching part of the heat-treatment process, you withdraw the heat from 4140 more rapidly than you would from 1345 you will create the bands of uneven hardness that caused the drilling problems that confronted GoCorp.

Mr. Drewes pointed out that the accelerated rate of quench cooling necessary to avoid irregular microstructure hardness caused a great deal of cracking in the shoes. That problem was minimized, he explained by segregating the forgings according to the steel mill "heat" or batch from which they came (this was the segregation earlier described by GoCorp's witness, Mr. Ringle) and then tailoring the heat-treatment procedures to the individual chemistry of the particular "heat" or batch involved. The various adaptations employed included the use of an interrupted quench, adjustment of both the temperature and composition of the quenching medium and a subsequent retempering. All of these measures are so-called "tricks" that are well known in the heat-treating trade.

With the machining problems thus overcome, Firestone was able to complete its contract, albeit some 14 months late. Resolution of the machining difficulties also enabled GoCorp to complete its own contract. It did so more than 23 months late, although some of that delay was due to its inability to obtain forgings from its subcontractor. That supplier was also Firestone's forging source and GoCorp agreed that its entire output of forgings could be diverted to the Firestone contract until completed. Again, as it had done with Standard, the Government extended both Firestone's and GoCorp's contract completion dates accordingly and without penalty. In 1970 Firestone successfully bid for a similar contract; this time, however, it was awarded the business at an increased price of $17.17 per shoe and performed satisfactorily and without complaint from any quarter.

In January 1972, in order to broaden its procurement base, the Government again revised its track shoe specifications in two respects. First, it narrowed the dimensional tolerances by raising the lower limits under which domestic suppliers had been habitually operating. While the shoe remained interchangeable with both prior domestic production and the Italian shoe, the effect of this change was essentially to compel domestic producers to build to the upper end of the prior tolerance range, as the Italians had done of their own volition. The second change was the reinstatement of 1345H as a steel option. Government research had disclosed that given the increased heft of the shoe resulting from raising the dimensional minima, 1345 was no longer subject to the objectionable cracking that had led to the earlier specification revision that included the elimination of 1345 as an optional material. As they had done prior to the specification changes instituted in 1968, the domestic producers promptly reverted to 1345 as their invariable choice for future production. Its use coupled with the increased dimensional requirements and the retention of the more rigid quality control procedures, has resulted in a shoe with an acceptable service life.

Plaintiffs strenuously except to two statements by the Board concerning the Government's knowledge of track shoe manufacturing technique, both Italian and domestic. First, referring to the subject of the bidders' conferences, the Board said: "Government representatives had no knowledge of specific production techniques used by Italian manufacturers * * *." 74–1 BCA at 49,821. Later it said: "The Government did not know until the hearing that the American industry was not drilling the shoes prior to induction hardening." 74–1 BCA at 49,824.

Plaintiffs refer to documents included among their Rule 4 exhibits before the Board as directly refuting the quoted statements. One such document is a trip report made by the Acting Director of the Mobility-Systems Laboratory of the Army's Tank—Automotive Command (ATAC) detailing the results of his October 1967

" * * * 'on site' review, analysis and evaluation of Italian T 130 track production facilities and techniques of manufacture." The report purports to set forth in sequence the various steps used by the Italians to produce a track shoe. As reported, the Italians performed all machining on the shoe, including drilling of the boss area holes, prior to induction hardening. Another exhibit is a September 1, 1967 report on T 130 track prepared by the Economic Engineering Branch of the Development & Engineering Directorate of ATAC. One segment of this rather extensive report is captioned U. S. Manufacturing Process and Quality Control for T 130 Track. It begins with the following introduction: "The manufacturing process to produce a track shoe consists of forging, hardening, machining, and rubber installment. The exact procedure within each process may vary from one prime contractor to another." Thereafter the report discusses the material (steel) and, in sequence, each of the various phases involved in producing a finished shoe. That enumeration reflects the understanding that all heat treatment, including the induction hardening of selected areas, is done prior to machining.

In sum, the above evidence clearly vindicates plaintiffs' claims of factual inaccuracy in the quoted phrases from the Board's opinion. Such vindication, however, is in the nature of a Pyrrhic victory because plaintiffs' own testimony demonstrates that their machining problems would not have been ameliorated at all had they been told in advance that the Italians machined their 4140-type steel before induction hardening it. Concerning Italian manufacturing techniques, Mr. Rippey, President of Firestone's Industrial Products Company, testified:

THE WITNESS: Sir, as I understand the Italian system, the only difference between their's and our's was that they heat-treated as we did to 25 to 32 Rockwell, if that is the hardness they used, and I am not certain about that. In any case, they did the basic heat treatment and hardening operation first. Then they drilled the bores and then they did the selective hardening or the induction hardening. We did it in reverse fashion. We did the heat-treating operation, then the induction hardening, 100 percent magnafluxing, and, after all that was done, we did the machining operation.

* * * * * *

Firestone's senior metallurgist, Mr. Drewes, testified that plaintiffs had indeed tried to solve their machining problems by employing what was reputed to be the Italian technique and found it not helpful. He explained:

* * * [A]s is well recognized, right adjacent to the selective hardened area by induction or whatever method, right next to that hardened area, there is a transition where it has heated it almost hot enough for hardening but not quite, so what it has actually done, annealed that narrow band. We thought maybe there might have been enough heat to get down into the boss to have annealed it in the area on the one side where we would be drilling and having softer spot on the one side. That could have caused our egg-shaped holes and the tendency of the drill to travel. We cut up a number of crossed sections, a number of scrapped forgings that had egg-shaped holes, some that had broken drills in them and so on. We also examined a number of the quality control specimens that were cut through these sections to determine the hardening pattern, but in no case, in no specimen that we examined had the heat penetrated deep enough to have had any effect whatsoever on machinability.

We further checked this. We took some quenched and tempered forgings and *drilled them without induction hardening* on a small lot basis. *There was no appreciable effect on the machinability.* Then to try to salvage them *we tried to induction harden them after. They curled up like a king-sized horsehoe. It was just another avenue explored that led nowhere.* [Emphasis added.]

* * * * * *

Moreover, it appears from plaintiffs' testimony that there were no details of the

Italian methods that would have been helpful to them. When asked to account for the Italians' apparent success in turning out a product that caused plaintiffs so much difficulty, both Mr. Rippey and Mr. Drewes attributed the difference not to technological innovation but entirely to production scale, *viz*, that the Italians were simply not confronted with the commercial constraints imposed by attempting to mass-produce the item for a highly competitive market.

Equally unimportant to the question of liability is the extent of the Army's procurement officials' familiarity with the domestic industry's production methods, there being no suggestion that there was any effective know-how within the industry that such officials could have been guilty of wrongfully withholding.

It is against the foregoing evidentiary background that plaintiffs' claims of Board error must be evaluated.

■ The Board rejected plaintiffs' claim that the contract specifications were defective in that, given then existing state of technological knowledge, the requirement for using 4140 steel rendered performance commercially impossible. it did so saying: "We find that the applicants had both the ability and the technology to resolve the production problems encountered and to perform their contracts successfully." 74–1 BCA at 49,824. It later amplified: " * * they in fact had reasonable means available to determine whether processes previously used would successfully accommodate the changed steel. They not only had the means but the opportunity, the obligation and the responsibility to do so. Successful production under the instant contracts did not require a scientific or technological breakthrough. It merely required the application of technology which was within the existing state of the art." 74–1 BCA at 49,828. These conclusions must be sustained because they are fully supported by evidence that plaintiffs themselves adduced through the testimony of Messrs. Rippey, Drewes, Cook and Ringle. Both Mr. Cook and Mr. Ringle testified that machining problems arose at the outset of performance of Standard's contract and that when it did both firms immediately concluded that the source of the problems had to be in the chemistry and/or heat-treatment processes that were being applied to the 4140 steel. The undisputed evidence shows that these problems had arisen by July 1968, the month in which Firestone was awarded its initial 4140 contract, and that Firestone was apprised [8] of both the nature of the problem and the measures being

---

8. The following colloquy occurred between Firestone's Mr. Rippey and the Board member who presided at the hearing:

JUDGE NORMAN: Just one question while I think of it. The same question I asked Mr.— the government's witness.

Are your production techniques in this field closely held? In other words—

THE WITNESS: I must say "yes". We try to keep everything we do, not only in this business, but in all our businesses, as secret as we possibly can.

JUDGE NORMAN: And this is normal in the industry, I assume? Standard has the same thing?

THE WITNESS: Absolutely. The reason is—we all buy the same raw materials. We all buy the same components from the same people.

JUDGE NORMAN: That wouldn't be true with respect to yourself and GoCorp though, would it?

THE WITNESS: You would have to—

JUDGE NORMAN: It would be difficult, if you are the prime and they are the sub or if they are the prime and you are the sub.

But still within the bounds of our specific businesses, we wouldn't allow them to know what we were doing on rubber compounding, for example.

JUDGE NORMAN: I mean just on this.

THE WITNESS: In the machining.

JUDGE NORMAN: Just on this track shoe problem.

THE WITNESS: You are talking about the machining?

JUDGE NORMAN: Yes. Whatever.

THE WITNESS: *Yes. Each of us knew what the other one was doing on that.*

JUDGE NORMAN: Whereas neither one of you was doing what Standard was doing, is that correct?

THE WITNESS: *We knew what Standard was doing where it involved GoCorp.* We knew what Standard was doing where it involved other sub-contractors where we were also getting material from them because we had people in those places so we could see what was going on. [Emphasis added.]

\* \* \* \* \* \*

taken by Standard to cope with it. Notwithstanding the benefit of this early warning, confirmed by GoCorp's experience not later than October 1968, when it began machining 4140 shoes for Firestone, it was not until May 1969, when it assigned Mr. Drewes to investigate the problem, that Firestone evaluated the situation from a metallurgical and heat-treatment standpoint, as Standard had done almost a year earlier. Mr. Drewes candidly acknowledged that there was available at the time a trade publication put out by United States Steel for the edification of its customers that specifically showed that, if one were to apply to 4140 steel heat-treatment procedures appropriate for use with 1345, a microstructure of uneven hardness would inevitably result. Both plaintiffs' attempted use of 1345 heat-treatment procedures on 4140 and the fact that no one on the Government's behalf ever encouraged or sanctioned such a procedure are undisputed on the present record. The source of the drilling problem, as confirmed by the physical evidence that Mr. Drewes personally observed, was precisely the microstructure characteristic that the United States Steel publication foretold would result from heat-treating 4140 by 1345 methods. Moreover, as soon as plaintiffs adjusted their heat-treatment procedure to conform with the teaching of the publication, drilling problems were basically eliminated. In these circumstances it cannot be said that the Board's rejection of the claim that prescription of 4140 steel rendered performance under the specifications commercially impossible lacked the support of substantial evidence. *Koppers Co. v. United States*, 405 F.2d 554, 186 Ct.Cl. 142 (1968).

■ The Board similarly rejected plaintiff's claim that they were misled to their detriment by a Government representative's statement at one of the bidders' conferences to the effect that 1345 and 4140 steels could be expected to machine substantially the same. Plaintiffs acknowl-

edge that the statement was made in the context of a reference by the representative to a well-known publication entitled Machining Data Handbook. That publication does indicate that *in the same range of hardness* the two steels will machine similarly. The difficulty with the claim is that their own evidence shows that the Handbook representation proved to be essentially [9] correct once plaintiffs adjusted their heat-treatment procedures to eliminate irregular microstructure and thereby achieve the basic comparability of hardness that the Handbook presupposed. In short, there simply was no misrepresentation as a matter of fact.

■ Equally untenable is plaintiffs' contention that the Government breached their contracts by wrongfully withholding from them its superior knowledge of methods for successfully producing a track shoe from 4140 steel. Again, the evidence belies the claim. First, the evidence does not reasonably indicate that the Government had any such knowledge. For example, the one respect in which it knew that Italian production methods differed from American (machining before induction hardening) involved a technique that, by the admission of Firestone's own officials, was not helpful at all. Indeed, it appears that the only way in which the Government could have obviated plaintiffs' problems would have been to affirmatively instruct them at the outset not to apply the same heat-treating procedures to 4140 that they had been using on 1345. Since plaintiffs' own evidence shows that this information was readily available in existing metallurgical literature, it cannot be said that the Government should have assumed that this was something likely unknown to them. That ingredient is indispensable to holding the Government liable for nondisclosure. *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774, 778, 160 Ct.Cl. 437, 444 (1963).

■ There remains the claim that by reinstating the permissive use of 1345 steel in

---

**9.** Plaintiffs concede that they never expected 4140 to machine fully as easily as 1345 because of the greater toughness purposely built into it

by the inclusion of chromium and molybdenum in its formulation.

1972 the Government impliedly recognized that the specifications that required 4140 were defective. A bare showing that a functionally interchangeable end product of equal or superior utility can be produced from specifications different from those previously in force does not imply defectiveness of the prior specifications. *WRB Corp. v. United States*, 183 Ct.Cl. 409, 436 (1968). Particularly is this true where the prior specifications have resulted in totally satisfactory production as, for example, in Firestone's previously mentioned 1970 contract for shoes of 4140 steel. *Cf. Foster Wheeler Corp. v. United States*, 513 F.2d 588, 595, 206 Ct.Cl. 533, 546–47 (1975).

■ Finally, the Board noted [10] that in no event could GoCorp recover additional costs attributable to drilling difficulties because at the time that it entered into its prime contract it was fully aware of those then unresolved problems by virtue of its subcontracting activities on behalf of both Standard and Firestone. As previously detailed, plaintiffs' own evidence leaves no doubt as to that actual and total awareness. On those facts, the Board's holding was clearly correct. *R.E.D.M. Corp. v. United States*, 428 F.2d 1304, 1310, 192 Ct.Cl. 891, 902–03 (1970).

## CONCLUSION

For the reasons given, plaintiffs' motion for summary judgment should be denied, defendant's motion for summary judgment granted, and the petition dismissed.