**PROPELLEX CORPORATION,**
Appellant,

v.

**Les BROWNLEE, Acting Secretary
of the Army, Appellee.**

No. 02–1358.

United States Court of Appeals,
Federal Circuit.

DECIDED: Sept. 9, 2003.

Steven E. Kellogg, Thompson Coburn LLP, of St. Louis, MO, argued for appellant. With him on the brief were Timothy F. Noelker and Linda L. Shapiro.

Sheryl L. Floyd, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With her on the brief was David M. Cohen, Director. Of counsel on the brief was Major Robert Neill, U.S. Army Legal Services Agency, Contract Appeals Division, of Arlington, VA.

Before MICHEL, RADER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Propellex Corporation ("Propellex") appeals from the final decision of the Armed Services Board of Contract Appeals ("Board") that sustained the final decision of the contracting officer denying in part Propellex's claim for additional compensation under two contracts between Propellex and the Department of the Army's Armament, Munitions and Chemical Command ("Army") for the production and delivery of gun primers. *Propellex Corp.,* ASBCA No. 50,203, 02–1 B.C.A. (CCH) ¶ 31,721, at 156,730–31, 2001 WL 1678757 (Dec. 27, 2001). Propellex sought recovery under a modified total cost method. The Board denied Propellex's appeal because it concluded, *inter alia,* that Propellex had failed to establish that it was impracticable for it to prove its actual losses directly, which is one of the requirements for recovery under the total cost method. *Id.* at 156,730. Because the decision of the Board is supported by substantial evidence and is free of legal error, we affirm.

## BACKGROUND

### I.

The Army awarded Propellex two fixed price contracts, contract no. DAAA09–88–C–0817 (the "817 contract") and contract no. DAAA09–90–C–0455 (the "455 contract"), for the production and delivery of a specified number of MK 45 primers. The 817 contract also called for the production and delivery of a specified number of MK 153 primers. A primer is a component of a gun shell. A shell generally includes a projectile and a propellant charge. The primer is an explosive device that ignites the propellant charge in the shell. The propellant charge in turn propels the projectile. A key component of a primer is black powder.

Both the contracts required that Propellex furnish the primers in lots. The 817 contract called for Propellex to furnish the MK 45 primers in nine separate lots and the MK 153 primers in one lot. The 455 contract called for Propellex to furnish MK 45 primers in five separate lots. Under each contract, before the Army would accept a lot for delivery, Propellex was required to submit samples of the primers in the lot to the Naval Surface Warfare Center ("NSWC") in Indian Head, Maryland, for, *inter alia,* testing of the moisture content of the black powder contained in the primers. Under the contracts, the moisture content of the black powder in the primers could not exceed a certain level. To ensure compliance with this require-

ment, Propellex performed its own moisture analysis on the black powder before sending the primers to NSWC for testing.

In September of 1990, Propellex sent to NSWC for testing samples of primers from lot six of the 817 contract. Following testing, the Army determined that the sample primers did not comply with the requirements of the contract because the moisture content of their black powder exceeded what was allowed under the contract. As a result, the Army rejected the lot. The Army stated that the excess moisture in the primers was the fault of Propellex, and it directed Propellex to resolve the problem.

In response to the Army's rejection, Propellex conducted an investigation to determine the cause of the alleged moisture in the primers. Although primer production continued during the investigation, Propellex diverted a number of its production employees to investigate the moisture problem. Propellex kept records of the tests it performed. However, the records did not include the number of employees, labor hours, or amount of materials involved in the testing. During the investigation, which spanned a period of two years, the Army also rejected lots 1, 2, and 3 of the 455 contract for excess moisture and other defects.

On February 16, 1993, after Propellex had completed its investigation, it notified the Army that it had not found any evidence indicating that the moisture content of the black power in its primers was above the level specified as acceptable in the contracts. It suggested that the Army determine if there was a defect in its testing procedures.

On April 7, 1993, Propellex's consultant, Edward Williams, and the Defense Con-

tract Management Agency's quality assurance engineer, Bryan Nussbaum, observed NSWC's testing of samples from lot five of the 455 contract. Over the next few months, they further observed and analyzed NSWC's testing procedures. As a result of their observations and analysis, they found defects in the procedures. Eventually, the Army accepted all of the primers that Propellex produced under the contracts.

On September 16, 1994, Propellex filed a claim with the contracting officer, seeking an equitable adjustment under the 817 and 455 contracts in the total amount of $1,790,065. In its claim, Propellex sought to recover the costs it incurred in conducting the moisture investigation, as well as certain costs it incurred in testing the moisture content of its primers prior to delivery to the Army.[1] It also sought to recover unabsorbed overhead costs, claim preparation costs, and consulting expenses. The contracting officer acknowledged that NSWC had committed errors in its testing of primer samples and that the Army was therefore responsible for some of the additional costs Propellex had incurred. The contracting officer determined that Propellex was entitled to a recovery in the amount of $77,325. However, she denied the balance of Propellex's claim:

> Based on a review of the Request for Equitable Adjustment, the supporting documentation available to the Contracting Officer and all other relevant facts, it is the Contracting Officer's decision that the Government was and is responsible for only a small portion of the claimed amounts. Based on insufficient data to further support damages claimed by Propellex, the Contracting Officer finds an Equitable Adjustment in the amount

---

1. When we refer to Propellex's claim for the costs of the moisture investigation, we are referring to both the claim relating to the moisture investigation and the claim relating to the testing of primers prior to delivery to the Army.

of $77,325.00 due to Propellex as a result of the Equitable Adjustment Claim under contracts DAAA09–88–C–0817 and DAAA09–90–C–0455.

Propellex timely appealed the contracting officer's final decision to the Board under the provisions of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 ("CDA").

## II.

Following a hearing, the Board granted Propellex's appeal with respect to entitlement, finding that NSWC had not conducted the primer acceptance tests in accordance with contract testing requirements. *Propellex*, 02–1 B.C.A. at 156,729. As a result, the Board awarded Propellex $33,110, plus interest, for claim preparation costs and consulting expenses. *Id.* at 156,730. However, the Board denied in toto Propellex's claims for the cost of the moisture investigation and for unabsorbed overhead costs. *Id.*

In denying Propellex's claim for the cost of the moisture investigation, the Board observed that Propellex had advanced the claim using a modified total cost method. *Id.* at 156,729. The Board stated that to recover under the total cost method, a contractor must prove: (1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs. *Id.* (citing *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir. 1991)). The Board noted that in using a modified total cost method to prove its claim, Propellex adjusted its bid for possible understatement and excluded some of the costs for which it admitted responsibility. *Id.* at 156,729–30. Nevertheless, the Board determined that Propellex had

failed to establish the impracticability of proving its actual losses directly and the lack of responsibility for the added costs. *Id.* at 156,730. It therefore denied Propellex's claim for additional compensation for increased costs under the contracts. *Id.* Propellex has timely appealed the Board's decision.[2] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## ANALYSIS

### I.

We review the Board's decision under the standard set forth in the CDA:

> The decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed.Cir. 1996) (quoting *Frank v. Dep't of Transp.*, 35 F.3d 1554, 1556 (Fed.Cir.1994)).

### II.

■ We have stated that the preferred way for a contractor to prove increased costs is to submit actual cost data because such data "provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that—equitable—and not a windfall for either the government or the contractor."

---

**2.** On appeal, Propellex does not challenge the Board's denial of its claim for unabsorbed overhead costs. Neither does it challenge the amount of the recovery allowed by the Board for claim preparation costs and consulting expenses.

*Dawco Constr., Inc. v. United States,* 930 F.2d 872, 882 (Fed.Cir.1991), *overruled on other grounds by Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995). As noted, Propellex advanced its claim using the modified total cost method. The modified total cost method is a modification of the total cost method. Under the total cost method, the measure of damages is the difference between the actual cost of the contract and the contractor's bid. *See Raytheon Co. v. White,* 305 F.3d 1354, 1365 (Fed.Cir.2002). Before a contractor can obtain the benefit of the total cost method, it must prove: (1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs. *Servidone,* 931 F.2d at 861. The modified total cost method is the total cost method adjusted for any deficiencies in the contractor's proof in satisfying the requirements of the total cost method. *Id.* at 861–62. In *Boyajian v. United States,* 191 Ct.Cl. 233, 423 F.2d 1231 (1970), the Court of Claims described the use of a modified total cost method:

> [T]he total cost method was used as "only a starting point" with such adjustments thereafter made in such computations as allowances for various factors as to convince the court that the ultimate, reduced, figure fairly represented the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint.

*Id.* at 1240 (citation omitted). Before the Board, Propellex sought recovery under a modified total cost method by adjusting its bid for possible understatement and by excluding from the computation of its claim some of the costs for which it admitted responsibility. *See Propellex,* 02–1 B.C.A. at 156,729–30. However, under its modified total cost method claim, Propellex still had the burden of proving the four requirements for a total cost recovery set forth above. The modified method simply was a way of easing that burden somewhat. *See Raytheon,* 305 F.3d at 1365; *Servidone,* 931 F.2d at 861–62.

The Board found that Propellex's proof of the reasonableness of its bids for the 817 contract and the 455 contract was adequate (total cost method requirement two). In addition, the Board noted that the government did not question the total costs Propellex incurred in performing the two contracts (total cost method requirement three). *Propellex,* 02–1 B.C.A. at 156,730. The Board determined, however, that Propellex had not established the impracticability of proving its added costs directly (total cost method requirement one) or that it was not responsible for the added costs (total cost method requirement four). *Id.*

In addressing the impracticability requirement, the Board noted that Propellex's witnesses testified, and its expert agreed, that Propellex did not segregate and record, and could not estimate, the labor hours and costs of the black powder moisture investigation. *Id.* The Board further noted that the hours and costs attributable to the moisture investigation were commingled with all labor hours and costs of contract performance, so that Propellex could not prove its costs directly. *Id.* Yet, the Board observed, Propellex's expert found no difficulty in approximating certain costs not attributable to the moisture investigation. *Id.* The Board also observed that, in connection with its case on entitlement, Propellex had documented its investigative efforts. *Id.* The Board concluded that "[s]uch evidence ... [did] not establish the impracticability of proving Propellex's claimed losses directly." *Id.* With respect to the fourth requirement for use of the modified total cost method, the Board stated that "[t]he most serious fail-

ure of Propellex's modified total cost proof ... [was] that it did not exclude from the claim amounts ... costs under both contracts 817 and 455 not attributable to black powder moisture investigation...." *Id.* The Board added that it had attempted to reconstruct from the record a reasonable approximation of those costs, but had found that the evidence did not permit such an approximation. *Id.* Accordingly, the Board concluded that Propellex's claim under a modified total cost method failed because Propellex had not established the impracticability of proving its actual losses directly and the lack of responsibility for the added costs. *Id.*

▇ On appeal, Propellex challenges both of these rulings. First, it argues that the Board erred in concluding that it had not established the impracticability of proving its actual losses directly. Second, it contends that the Board erred when it concluded that the record did not allow for the removal of certain costs from Propellex's modified total cost claim. Because substantial evidence supports the Board's conclusion that Propellex did not establish the impracticability of proving its actual losses directly and because the Board's decision is otherwise free of legal error, we affirm the decision of the Board. Under these circumstances, it is not necessary for us to decide the issue of whether Propellex satisfied the fourth requirement of the total cost method.

Propellex argues that the Board's conclusion that it failed to establish the impracticability of proving its actual losses directly is legally incorrect and not supported by substantial evidence. It acknowledges that, under the modified total cost method, a contractor must establish the impracticability of proving its actual losses directly (requirement one) and must identify and remove costs that are unrelated to its claim (requirement four). It states that it complied with requirement

four by identifying some costs not related to the moisture investigation and by removing them as required. It then asserts that the Board improperly penalized it for complying with this requirement when it held that since Propellex was able to estimate some costs not related to the moisture investigation, it should have been able to estimate the costs related to the moisture investigation as well. Propellex contends that the Board's reasoning is inconsistent with the principles underlying the total cost method and constitutes reversible error because it makes it impossible for any contractor to satisfy all the requirements for a total cost recovery. Propellex states:

> According to the Board, offering proof to satisfy the fourth element of a total cost claim, as [Propellex] did, eliminates a contractor's ability to satisfy the first element—that it cannot prove its actual losses directly. Put another way, the Board unwittingly eviscerated this long recognized—although admittedly not favored—method for calculating damages.

Propellex also argues that the Board's decision is not supported by substantial evidence. It contends that the evidence of record establishes that Propellex's accounting system did not track the costs associated with the moisture investigation. It notes that the Board itself recognized that the costs of the moisture investigation had been commingled with all other costs and could therefore not be separately computed. Propellex states that the costs unrelated to the moisture investigation that it did eliminate from its claim were captured by its accounting system. It contends that, unlike those costs, the costs related to the moisture investigation were not captured and thus could not be separately computed. Finally, Propellex contends that our decision in *Servidone* supports its contention that it was entitled to use the modified total cost method to prove its claim.

For its part, the government argues that substantial evidence supports the Board's finding that Propellex failed to establish the impracticability of proving its actual losses directly. Noting that Propellex's expert witness was capable of identifying and segregating some of the extra costs for which Propellex was responsible, it asserts that Propellex had the capability of estimating the costs it incurred in connection with the moisture investigation. The government also argues that, in any event, Propellex kept detailed records of the moisture investigation, from which it should have been possible for it to estimate the costs it incurred in connection with the investigation.

We agree with the government that substantial evidence supports the Board's finding that Propellex failed to demonstrate the impracticability of proving its actual losses directly. The evidence shows that Propellex could have set up its accounting system to track the costs of the moisture investigation and that it failed to do so. At trial, Propellex's controller, Bert Nordman, testified that he could have set up an account within Propellex's cost accounting system to segregate the actual costs of the moisture investigation, but did not do so:

Q. Why didn't you open a separate account for Propellex to record the costs relating to the extra effort in determining if there was a moisture problem?

A. It's—it's not our practice to do that normally. If there was problems, you know, we would work—work those issues out as we did. We just capture in our work order costs. *And in this contract here it—I might have—I might have opened up a separate account for it if I would have thought that this was not Propellex's responsibility. We*

*could have opened up another account and charged time to it, you know, for whatever. But we didn't do it because we thought it was our responsibility* so we never changed any of the methods that we're doing to capture our costs, same as we've done it for 25, 26 years.

(emphasis added). Similarly, Propellex's Facilities Manager, Judy Jackson, testified that in a situation such as the moisture investigation where hourly workers were pulled off the production line to assist in special testing, Propellex's labor records should have reflected which employees were engaged in the testing and the amount of time they spent on such work:

Q. *If you pulled hourly people off the line to assist in this moisture investigation, then their labor records, their tickets should reflect this, correct?*

A. They should, *yes.*

. . .

Q. The labor tickets, Ms. Jackson, did they indicate specifically what activity the direct laborer was working on or did it only indicate—well, *what did it indicate on the labor ticket?*

A. Well, *our normal procedure was that if we had rework or special testing there would be like a number set up or at some times there was a R put behind the project number to indicate a rework and that was designated when their labor went into our computerized system* . . . . There were production reports that should have generated that . . . would indicate that there was something on a rework or if it was a—like a special project, there would have been a project number assigned to it.

(emphases added). In short, the evidence shows that Propellex could have set up its

accounting system to track the costs of the moisture investigation, but that it failed to do so.

■ Although Propellex does not dispute that it could have set up its accounting system to track the costs of the moisture investigation, it argues that because it "reasonably believed that it was to blame [for the moisture problem], there was no reason [for it] to set up an account to track such costs." We are not persuaded by this argument. First, Propellex did record in detail every aspect of the testing related to the moisture problem, with the exception of costs. Second, assuming Propellex believed it was responsible for the moisture problem, it was all the more important for it to segregate costs relating to that problem from costs incurred under the contracts for which it was entitled to be paid by the Army.[3] Where it is impractical for a contractor to prove its actual costs because it failed to keep accurate records, when such records could have been kept, and where the contractor does not provide a legitimate reason for its failure to keep the records, the total cost method of recovery is not available to the contractor. *See*

*WRB Corp. v. United States,* 183 Ct.Cl. 409, 426 (1968) (noting the contractor's failure to maintain accurate cost records during performance and that its only excuse for the failure was that it did not expect to become involved in litigation over the project, and stating that this "was a feeble justification for taking refuge in the total-cost approach"); *S.W. Elecs. & Mfg. Corp.,* ASBCA Nos. 20,698 & 20,860, 77–2 B.C.A. (CCH) ¶ 12,631, 1977 WL 2297 (June 23, 1977) (noting that if it is impossible to detail the cost impact of a change because the contractor failed to keep accurate records when they could have been kept, the total cost method will not be used), *aff'd,* 228 Ct.Cl. 333, 655 F.2d 1078 (1981); *Youngdale & Sons Constr. Co. v. United States,* 27 Fed.Cl. 516 (1993) (rejecting the use of the total cost method when the contractor knew of the claim at the time the costs began to accumulate but did not segregate costs).[4]

■ In sum, substantial evidence supports the Board's conclusion that Propellex did not establish the impracticability of proving its actual losses directly and thus cannot recover under the modified total cost method.[5]

3. The fact that each of the contracts was a fixed-price contract does not alter our conclusion because where a contractor can capture its increased costs, like Propellex could have in this case, it should do so regardless of whether its contract is a fixed-price contract. This is good business practice, and fosters accountable and efficient contract performance.

4. We note that other evidence that the Board relied on also supports the Board's finding that Propellex failed to establish the impracticability of proving its actual losses directly. For example, the evidence shows that Propellex's expert was capable of identifying and segregating some of the extra costs for which Propellex was responsible, thus demonstrating that Propellex had the capability of estimating the costs it incurred in connection with the moisture investigation.

5. We recognize that we are affirming the Board's decision partly based on evidence that the Board did not cite in reaching its impracticability conclusion. However, as an appellate court, we "may affirm a judgment of a district court on any ground the law and the record will support so long as that ground would not expand the relief granted." *Glaxo, Inc. v. TorPharm, Inc.,* 153 F.3d 1366, 1371 (Fed.Cir.1998). This principle applies equally to decisions of the Board. *See Firestone Tire & Rubber Co. v. United States,* 214 Ct.Cl. 457, 558 F.2d 577, 579 (Ct.Cl.1977) (reviewing a decision of the Board and recognizing that "a reviewing court should affirm the decision below if supported by facts implicit in the record on which that decision was rendered"). Moreover, we may make a finding of fact on evidence that is undisputed. *Smith-Kline Diagnostics, Inc. v. Helena Labs. Corp.,* 859 F.2d 878, 886, n. 4 (Fed.Cir.1989). In

We do not agree with Propellex that the Board erred as a matter of law when it contrasted Propellex's ability to estimate certain costs that were not related to the moisture investigation with its inability to directly prove the investigation's costs. Contrary to Propellex's view, under the Board's ruling, compliance with requirement four of the total cost method, i.e., removing the costs that were not related to the moisture investigation, does not make it impossible to establish the first requirement, i.e., the impracticability of proving the contractor's losses directly. That is so because a contractor can always show why a court should not rely on its ability to segregate and remove certain costs in determining whether the contractor established the first requirement. The four requirements of the total cost method are distinct requirements and a contractor must prove all of them before it can obtain the benefit of the total cost method. Accordingly, it was not error for the Board to rely on Propellex's ability to estimate the costs that were not related to the moisture investigation as undercutting Propellex's argument that it is impracticable for it to prove its losses directly.

Finally, we do not think that *Servidone* helps Propellex. In *Servidone*, the contractor, Servidone Construction Corporation ("Servidone"), had a contract with the United States Army Corps of Engineers to construct an embankment, a spillway, outlet works, and several roads on an earthen dam near Dallas–Fort Worth, Texas. 931 F.2d at 860–61. After Servidone began work, it encountered many problems due to differing site conditions. *Id.* at 861. After incurring costs well beyond its bid price, Servidone filed a claim seeking an equitable adjustment under the contract. *Id.* When its claim was rejected, it filed suit in the United States Claims Court,

now the Court of Federal Claims. *Id.* The court found the government liable for Servidone's increased costs by reason of differing site conditions, and awarded damages to Servidone using the modified total cost method. On appeal, we affirmed, recognizing the above-mentioned four requirements of the total cost method and noting that "[t]he Claims Court carefully found facts and correctly applied the law in a rare case justifying the total cost method." *Id.* at 862.

Propellex relies on *Servidone* and argues that, just as the volume of dirt for the embankment in *Servidone* did not change because of the differing soil conditions, so the number of primers Propellex sold to the Army did not change as a result of the moisture issue. In both cases, argues Propellex, the "change" was the additional effort it took to produce the same volume of work. It contends that here, as in *Servidone*, the additional effort was performed as a part of the anticipated work, causing the additional effort to be indistinguishable from normal contract performance. Accordingly, it argues that, like the contractor in *Servidone*, it was entitled to use a modified total cost method to recover its increased costs.

We do not agree with Propellex's analysis of *Servidone*. The use of the modified total cost method was appropriate in *Servidone*, not because of the nature of the contract work, but because that was the only meaningful way to express the difference between the contractor's reasonable anticipated costs and its reasonable actual costs. In other words, in *Servidone*, there was no way for the contractor to segregate the costs for the additional work it had to perform to complete the project. To the contrary, in this case, Propellex could have measured the additional investigative costs

---

this case, as noted, Propellex does not dispute that it could have set up its accounting system

to capture the costs related to the moisture investigation.

related to the moisture problem by setting up its accounting system to measure such costs. Accordingly, unlike the contractor in *Servidone*, Propellex is not entitled to recover under a modified total cost method.

## CONCLUSION

Because substantial evidence supports the Board's conclusion that Propellex has not established the impracticability of proving its losses directly, as required under the total cost method, the decision of the Board is

*AFFIRMED.*

No costs.