Hansford T. JOHNSON, Appellant,

v.

ADVANCED ENGINEERING &
PLANNING CORPORATION,
INC., Appellee.

No. CIV.A. 03–652–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 17, 2003.

Richard W. Sponseller, U.S. Attorney Office, Alexandria, VA, for Plaintiffs.

James Scott Phillips, Centre Law Group LLC, McLean, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this appeal from a decision of the Armed Services Board of Contract Appeals ("the Board"), Hansford T. Johnson, Acting Secretary of the Navy (hereinafter "the Navy"), seeks reversal of the Board's decision allowing Advanced Engineering and Planning Corporation, Inc. ("AEP-CO") to recover preparation costs for its submission of a Request for Equitable Adjustment ("REA") to the contracting officer ("CO"). At issue is whether AEPCO's September 29, 2000 REA was a claim within the meaning of the Contract Disputes Act ("CDA"), for which the costs of preparation are not recoverable.

### I.

The facts relevant to this appeal were found by the Board[1] and, for the most part, are undisputed. This case arises from a contract between the Naval Sea Systems Command Supervisor of Shipbuilding, Conversion, and Repair ("Navy") and AEPCO, Contract No. N0024–94–H–8687, Job Order No. 0072. Under the contract, AEPCO was to perform twenty ship alteration work items on the USS MT. WHITNEY for the firm fixed price of $1,340,242.

---

**1.** *See Appeals of Advanced Engineering & Planning Corporation, Inc.,* Docket Nos. 53366 & 54044 (ASBCA Jan. 21, 2003) (hereinafter "ASBCA Opinion").

In the course of contract performance, seventy-seven (77) formal contract changes, known as "sequences," were initiated by either AEPCO or the Navy. Each sequence required AEPCO to propose a price for the additional work. Once a proposal was submitted, the parties sought to negotiate a price for the sequence. Of the 77 sequences initiated, four were voided and 44 were incorporated into bilateral modifications. The remaining twenty-nine (29) sequences were negotiated, but not finalized into bilateral modifications. Although a number of sequences remained to be negotiated and settled, the Navy on April 30, 2000 issued a "Certificate of Completion and Acceptance of Work" for the work performed on the contract.

In July 2000, Edward Stroud, the Navy's CO and Cameron Potter, AEPCO's production manager, met to negotiate the remaining 29 sequences and successfully settled 26. The sequence settlements were reflected in separate "settlement sheets" initialed by Potter and setting forth the date and amount of settlement.

On August 4, 2000, AEPCO's counsel retained C. Leonard Willis to assist AEPCO in preparing an REA on the contract. Thereafter, on August 11, 2000, before the Navy issued formal contract modifications relating to the Stroud–Potter settlement of the 26 sequences, AEPCO returned the settlement sheets and by letter notified the Navy that it reserved the issue of impact costs such as delay, disruption and loss of efficiency.[2] In its letter, AEPCO explained that these significant impact costs

were attributable to various factors that it was in the process of analyzing. AEPCO further noted that this analysis, when completed, would be submitted to the Navy, after which AEPCO would seek a meeting to settle all open issues in order to close the contract. AEPCO asked that the Navy, in the meantime, process the agreed direct charges relating to the 26 settled sequences. The Navy declined to do so.

The parties, it appears, dispute the scope of their settlement on the 26 sequences. According to CO Stroud, the settlement of these 26 sequences included consideration for all costs, including payment for any delay and disruption caused by the changes. Yet, according to AEPCO, in July 2000, CO Stroud and Potter reached a verbal agreement on reimbursement for direct costs associated with the 26 sequences and AEPCO later sought to confirm that this agreement did not waive its right to recover an equitable adjustment for the indirect consequences of these changes.[3]

On October 2, 2000, AEPCO submitted an REA dated September 29, 2000, seeking compensation in a sum certain for the 29 formal change orders and for alleged constructive changes. The REA was certified in accordance with Department of Defense Federal Acquisition Regulation ("DFARS") 252.243–7002 (Requests for Equitable Adjustment); it was not certified in accordance with Federal Acquisition Regulation ("FAR") 33.207, the regulation applicable to contractor claims submitted under the Contract Dis-

---

**2.** In returning the settlement sheets, AEPCO deleted the entries in the "disruption elements" section of the settlement sheets, and replaced them with an asterisk, which in turn referred to a statement that costs associated with delay, disruption and loss of efficiency were not settled.

**3.** At his deposition taken on September 12, 2002, Potter testified that "[his] credibility

with Ed Stroud will probably never be the same after this." When asked why, he explained "[b]ecause we sat down and we agreed to something and then I disagreed." He also testified that sending the August 11, 2000 letter was "strictly a legal decision, not my decision," and that "in fact, legal wrote the statement that you see on it."

putes Act of 1978 ("CDA"). AEPCO's REA included a section entitled "Scoping and Pricing," setting out costs incurred in preparing the REA, including attorney and consultant fees.[4]

After submission of the REA, the parties engaged in settlement negotiations from approximately October 2000 until April 2001. On April 6, 2001, AEPCO asked the CO to issue a final decision because negotiations had reached an impasse. By letter dated April 12, 2001, AEPCO appealed from the failure of the CO to render a final decision on the REA.

On June 18, 2001, AEPCO forwarded to CO Stroud an "updated" REA dated April 30, 2001. This updated REA incorporated new forward pricing rates and was certified in accordance with FAR 33.207 (Contractor Certification) as a CDA certified claim.

The Board docketed AEPCO's appeal on May 1, 2001. AEPCO moved for partial summary judgment on Count I (Formal Change Orders), Count II (Constructive Change Order), and Count VI (Scoping and Pricing), while the Navy cross-moved for summary judgment with respect to Count VI and two other issues unrelated to this appeal.[5] In its decision, the Board (1) granted the Navy's summary judgment motion on the two unrelated issues; (2) granted AEPCO's motion for partial summary judgment as to entitlement on Count I, except as to one sequence; (3) denied

AEPCO's motion for partial summary judgment as to entitlement on Count II; and (4) granted AEPCO's motion for partial summary judgment on Count VI, awarding AEPCO its REA preparation costs, except to the extent any such costs related to updating the REA and converting it into a CDA claim. *See* ASBCA Opinion at 24. The Navy appeals here the Board's decision on Count VI.[6]

Under Count VI, AEPCO sought $270,017 for preparing and submitting its September 29, 2000 REA to the Navy to serve as a basis for a negotiated settlement. The amount claimed also included the costs of AEPCO's efforts in amending and supplementing the original REA after negotiations proved unsuccessful. AEPCO argued that the costs it claimed in preparing the September 29, 2000 REA were allowable under FAR 31.205–33, and were not post-claim legal or litigation costs precluded under FAR 31.205–47. The Navy, in opposition, argued that by October 2000, when the September 29, 2000 REA was submitted, the parties were in a claim status and as such, AEPCO was not entitled to recover costs incurred in preparing and submitting its September 29, 2000 REA because it was, in fact, a CDA claim. Faced with these conflicting contentions, the Board held that AEPCO's September 29, 2000 REA was not a CDA claim and hence the preparation costs were allowable under FAR 31.205–33(b)[7] as such costs were incurred for the purpose of seeking a

---

**4.** The conclusion section of the REA also stated that

> AEPCO requests that the Contracting Officer comply with the provisions of the Contract *Disputes Act of 1978, as amended, and* act on this Proposal within not more than sixty (60) days. If no such action is forthcoming within such time, AEPCO will request a Final Decision of the Contracting Officer.

**5.** These two issues were (1) whether AEPCO was entitled to delay, disruption and impact

costs associated with 44 sequences, and (2) whether the Navy was required to use the forward pricing rates approved by SUPSHIP on January 23, 2001 in effecting any equitable adjustment to which AEPCO is entitled. *See* ASBCA Opinion at 2.

**6.** In addition to the Navy's appeal, AEPCO also filed a motion for summary affirmance of the Board's decision on Count VI.

**7.** FAR 31.205–33(b) states that "[c]osts of professional and consultant services are allow-

comprehensive resolution of the entire job order.[8] It is this finding that the Navy challenges. The amount of costs recoverable was reserved for a further hearing before the Board.

## II.

■ The Board's legal rulings are reviewed *de novo;* its factual determinations are reviewed under a substantial evidence standard. 41 U.S.C. § 609(b); *see also SMS Data Products Group, Inc. v. United States,* 900 F.2d 1553, 1555 (Fed.Cir.1990). It is also true that although conclusions of law are reviewed *de novo,* some deference is given to the Board's interpretations of applicable contract regulations because it has expertise in the area. *See SMS Data Products Group,* 900 F.2d at 1555.

■ A review of the record and the Board's opinion reveals that the Board's decision allowing AEPCO to recover its REA preparation costs is correct. First, the Board correctly concluded that AEPCO's September 29, 2000 REA was not a CDA claim when submitted to the contracting officer. This conclusion follows from the regulatory definition of such a claim. Thus, FAR 33.201, the applicable federal acquisition regulation in existence at the time of the contract, defines "claim" as

[A] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or

relating to the contract. . . . *However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and 33.207.* A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

48 C.F.R. § 33.201 (2001)[9] (emphasis added). Therefore, to qualify as a CDA claim, a claim must be certified as required by the Act and FAR 33.207. Moreover, DFARS 243.204–70 makes clear that the certification required for an REA under 10 U.S.C. § 2410(a), as implemented in DFARS 252.243–7002, differs from the certification required by the Contract Disputes Act. *See* 48 C.F.R. § 243.204–70. In this regard, the Defense Department's federal acquisition regulations clearly state that "[i]f the contractor has certified a request for equitable adjustment in accordance with 10 U.S.C. 2410(a), and desires to convert the request to a claim under the Contract Disputes Act, the contractor shall certify the claim in accordance with FAR Subpart 33.2." *Id.* As a result, the plain meaning of the certification requirement as stated in FAR 33.201, read in conjunction with DFARS 243.204–70, compels the conclusion that AEPCO's September 29,

able subject to this paragraph and paragraphs (c) through (f) of this subsection when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government." 48 C.F.R. § 31.205–33(b).

**8.** The Board further held, however, that the costs incurred in updating the original September 29, 2000 REA and converting it into a

CDA claim dated April 30, 2001 and submitted to the CO on June 18, 2001—costs incurred after October 2, 2000—were unallowable costs incurred to promote the prosecution of a CDA claim against the Navy.

**9.** This paragraph defining "claim" has been omitted from the current version of FAR 33.201. It now appears verbatim in FAR 2.101.

2000 REA was not a CDA claim. Yet, importantly, the Board then correctly recognized that this did not end the analysis, for it remained necessary, given that the September 29, 2000 REA was not a CDA claim, to consider whether the costs of preparing it were nonetheless costs "incurred in connection with the prosecution of a[CDA] claim against the Government." *Bill Strong Enterprises, Inc. v. Shannon,* 49 F.3d 1541, 1549 (Fed.Cir.1995). If so, then such costs would not be recoverable. But, on the other hand, if the September 29, 2000 REA preparation costs were in fact contract administration costs, then such costs would be recoverable by AEPCO. *See id.* at 1550; *see also* 48 C.F.R. § 31.205–33.

■ On this question, the Board concluded first that the preparation costs expended in connection with the April 30, 2001 updated REA, including its conversion into a CDA claim, were costs incurred to promote the prosecution of a CDA claim and hence not recoverable. Next the Board permissibly concluded, based on substantial record evidence, that the REA preparation costs incurred before the updating and conversion of the September 29, 2000 REA were recoverable as contract administration costs. In other words, the Board correctly concluded that the certification of the April 30, 2001 REA as a CDA claim operated to preclude recovery of any costs relating to the preparation of that updated REA. But the Board also correctly recognized that it had to inquire, as a factual matter, into whether the REA preparation costs incurred prior to the updating process and CDA certification were or were not a part of the prosecution of a

CDA claim. In concluding that these costs were not incurred to promote the prosecution of a CDA claim, but were instead recoverable contract administration costs, the Board correctly relied on substantial evidence in the record.[10]

The principal argument the Navy advances against this conclusion is that the Board improperly relied on *Bill Strong Enterprises, Inc. v. Shannon,* 49 F.3d 1541 (Fed.Cir.1995), to determine whether AEPCO's REA was a claim under the CDA. In the Navy's view, this reliance was improper because *Bill Strong*'s discussion of how to determine when a contractor's submission is a CDA claim was overruled by *Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995) (en banc). Under *Reflectone,* the Navy contends, there are only three requirements for a CDA claim and CDA certification is not one of them; *Reflectone* requires only "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." *Reflectone,* 60 F.3d at 1575.

The Navy's argument misconceives the Board's decision. A review of that decision makes clear that the Board did not rely on *Bill Strong* to determine whether the September 29, 2000 REA was a CDA claim; instead the Board determined that AEPCO's September 29, 2000 REA was not a CDA claim by reference to the requirements of FAR 33.201. As noted, this provision states that to qualify as a CDA claim, a claim must be certified as required by the Act and FAR 33.207.[11] It is undisputed that AEPCO's September 29, 2000 REA was not so certified; it was instead certified in accordance with DFARS

---

10. *See infra* pp. 856–57.

11. FAR 33.207 requires the following certification:

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge

and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

48 C.F.R. § 33.207(c).

252.243–7002, which merely specifies the manner in which an REA must be certified.[12] On this basis, the Board correctly concluded that AEPCO's September 29, 2000 REA was not a CDA claim.[13] Yet, the Board also correctly recognized that entitlement to REA preparation costs is not automatic simply because the REA itself is not a CDA claim and that it is necessary in such circumstances to consider further whether, despite the absence of CDA certification, the claimed costs were nonetheless incurred in connection with the prosecution of a CDA claim. It was here that the Board relied on *Bill Strong*'s interpretation of FAR 31.205–33(d)[14] to determine that AEPCO's preparation and consulting costs for the original September 29, 2000 REA were allowable because they were not "incurred in connection with the prosecution of a[CDA] claim against the Government." *See Bill Strong*, 49 F.3d at 1549 (internal quotation marks omitted).

Contrary to the Navy's contention, *Reflectone* did not overrule the portion of the *Bill Strong* decision on which the Board relied, or eliminate the CDA certification requirement. *Reflectone* merely overruled *Dawco Construction, Inc. v. United States*, 930 F.2d 872 (Fed.Cir.1991), and its progeny, holding instead that the "FAR 33.201 definition of 'claim' does not require a pre-existing dispute *unless* the submission is a 'routine request for payment.'" *Reflectone*, 60 F.3d at 1579 (emphasis in original). *Reflectone* clearly did not address the portion of FAR 33.201 that concerns certification. *See id.* at 1578 n. 8 ("We do not comment on those conversion requirements *or any other requirements, that like certification,* a contractor may have to satisfy to submit a CDA 'claim' the CO has jurisdiction to decide.") (emphasis added). For this reason, *Reflectone*'s three-part test understandably makes no mention of the certification requirement that is also

**12.** DFARS 252.243–7002 requires that the contractor make the following certification: "I certify that the request is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief." 48 C.F.R. § 252.243–7002(b).

**13.** In this respect, the Board also made note of the following to bolster its conclusion:

In this regard, DFARS 243.204–70(a), "Certification of requests for equitable adjustment," provides that "[a] request for equitable adjustment to contract terms that exceeds the simplified acquisition threshold may not be paid unless the contract [sic] certifies the request in accordance with the clause at 252.243–7002." Moreover, DFARS 243.204–70(c) makes clear that the certification required by 10 U.S.C. 2410(a) is different from the certification required by the CDA, and if the contractor has certified a request for equitable adjustment in accordance with 10 U.S.C. 2410(a), and wants to convert the request to a CDA claim, it must certify the claim in accordance with FAR Subpart 33.2 .... Here, AEPCO does not seek to correct the certifi-

cation in accordance with 41 U.S.C. § 605(c)(6). Therefore we need not reach the issue of whether the DFARS certification can ever be considered a defective CDA certification correctable under 41 U.S.C. § 605(c)(6).
ASBCA Opinion at 22.

**14.** At one point the *Bill Strong* opinion mistakenly references FAR 31.201–33. *See* 49 F.3d at 1549 ("Our next step in analyzing FAR 31.201–33 is to interpret what is meant by 'incurred in connection with the prosecution of a[CDA] claim against the Government.'"). This citation appears to be a typographical error, as FAR 31.201–33 does not exist in the Code of Federal Regulations. It is likely that the court in *Bill Strong* meant to refer to the 1987 version of FAR 31.205–33, which it correctly cites to in all other portions of the opinion and which includes the language the court quotes when mistakenly referring to FAR 31.201–33. *See Bill Strong*, 49 F.3d at 1544 n. 2 (quoting FAR 31.205–33(d) in full). The Board decision in this case quotes the passage from *Bill Strong* that mistakenly references FAR 31.201–33 without noting or correcting the mistake.

necessary for a CDA claim.[15] *Id.* at 1575. Since *Reflectone*, moreover, the Federal Circuit has made clear that *Reflectone*'s three-part test is not the only prerequisite for a CDA claim, citing *Bill Strong* for the proposition that a "submission 'cannot be considered a formal CDA claim [if][it] did not request a final decision of the CO.'" *See James M. Ellett Construction Co., Inc. v. United States*, 93 F.3d 1537, 1543 (Fed. Cir.1996);[16] *see also* 41 U.S.C. § 605(a). Like submission to the CO for a final decision, the requirement that a CDA claim be certified in a particular manner is a statutory requirement. *See* 41 U.S.C. § 605(c)(1); 48 C.F.R. § 33.207 (regulation implementing statutory certification requirement). Although a defect in certification does not deprive the Board of jurisdiction over a claim, the Board cannot enter a final judgment until a defective certification is corrected. *See* 41 U.S.C. § 605(c)(6). As noted earlier, the certification required for an REA differs from that required for a claim under the CDA. *See* 48 C.F.R. § 243.204–70. *Reflectone* did not alter any of this, nor did it eliminate the certification requirement for a CDA claim. Thus, the Board in this case did not run afoul of *Reflectone*, nor did it improperly rely on *Bill Strong* to determine that AEPCO's September 29, 2000 REA was not a CDA claim.

Yet, the Board did rely on *Bill Strong* to determine whether AEPCO's preparation and consulting costs for the September 29, 2000 REA were nonetheless unallowable under FAR 31.205–33(d)[17] as costs incurred in connection with the prosecution of a CDA claim. This reliance was appropriate because this aspect of the *Bill Strong* opinion was not overruled by *Reflectone*. To repeat, *Reflectone* overruled *Dawco* and its progeny by doing away with *Dawco*'s pre-existing dispute rule. *Reflectone*, 60 F.3d at 1578.[18] *Bill Strong*, relying on *Dawco*, held that the claim at issue there was not a CDA claim because there was no pre-existing dispute when it was submitted to the CO.[19] *Reflectone* reversed this holding, but it did not disturb *Bill Strong*'s further discussion of what constitutes legal, accounting, or consulting costs incurred in connection with the prosecu-

15. This may have occurred because the submission at issue in *Reflectone*, styled as a "Request for Equitable Adjustment," was apparently certified in accordance with both the CDA and FAR 33.207. *See Reflectone*, 60 F.3d at 1574 ("Reflectone's President and CEO certified the REA and requested a decision from the CO.").

16. *See also id.* at 1544 n. 4 ("[Appellant] contends that a valid claim does not require a request for a final decision in light of *Reflectone*'s holding that a claim need only meet the prescribed three-part test. Not so; the requirement that a claim be submitted to a contracting officer for a decision is statutory and was met by the contractor in that case.").

17. FAR 31.205–33(d) is no longer the relevant provision. The pertinent provisions of the 1987 version of FAR 31.205–33(d) discussed in *Bill Strong* have since been recodified in FAR 31.205–47 (now entitled "Costs related to legal and other proceedings"), specifically FAR 31.205–47(f)(1) (making costs incurred in connection with the prosecution of claims against the Government unallowable) and FAR 31.205–47(a) (including the costs of legal services and the services of accountants and consultants in the definition of "costs"). The Board recognized this by quoting these provisions of FAR 31.205–47 at page 20 of its opinion.

18. *See id.* at 1579 ("To the extent that *Dawco* and its progeny have been read to also hold that, based on FAR 33.201, a 'claim' (other than a routine request for payment) must already be in dispute when submitted to the CO, they are hereby overruled.") (footnote omitted).

19. *See* 49 F.3d at 1550 ("[T]he Board majority also erred in concluding that BSE submitted a CDA claim ... because the Government did not at that time dispute BSE's assertion of a right to increased compensation. Nor did the situation ever ripen into a dispute.").

tion of a CDA claim against the government.[20]

In this respect, *Bill Strong* identifies three distinct categories of legal, accounting, and consulting costs: "(1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract; and (3) costs incurred in connection with the prosecution of a CDA claim." 49 F.3d at 1549. The court there held that "costs that fall within the first and second categories are presumptively allowable if they are also reasonable and allocable." *Id.* The opinion further explained that

> [i]n classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim, contracting officers, the Board, and courts should examine the objective reason why the contractor incurred the cost. If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration allowable under FAR 31.205–33, even if negotiation eventually fails and a CDA claim is later submitted. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205.33.

*Id.* at 1550 (internal citations omitted). Consistent with this, the Board here concluded that the costs incurred in preparing AEPCO's September 29, 2000 REA were costs incurred in connection with the administration of a contract because they were incurred specifically "for the purpose of seeking a comprehensive resolution of the entire job order, and not for the purpose of promoting the prosecution of a claim against the Government." ASBCA Opinion at 23–24.

■ The Navy contends, however, that even if *Reflectone* did not directly overrule *Bill Strong*'s discussion of costs incurred in connection with the prosecution of a CDA claim, its emphasis on costs incurred to further the negotiation process as an example of contract administration costs cannot survive the spirit of *Reflectone*'s holding. In this respect, the Navy relies on *Plano Builders Corp. v. United States,* 40 Fed. Cl. 635 (Fed.Cl.1998), to argue that *Bill Strong*'s test is no longer viable to determine whether a submission furthers an administrative purpose. The Navy argues that because *Reflectone* discards *Dawco*'s pre-existing dispute rule, an exchange of information and negotiations between parties is a "reasonably expected part of a contractor's prosecution of a CDA claim," and not a separate phase preceding the prosecution of a CDA claim. *Plano,* 40 Fed. Cl. at 642. This argument is unpersuasive. First, the Navy's reliance

---

**20.** FAR 31.205–33(d) (1987) states that "[c]osts of legal, accounting, and consultant services incurred in connection with . . . the prosecution of claims or appeals against the Government (see 33.201) are unallowable . . . ." In *Bill Strong,* the court held that "by referring specifically to FAR 33.201, the amended cost principle of FAR 31.205–33 recognized the word 'claim' as a term of art, the meaning of which is set forth in FAR 33.201." 49 F.3d at 1549. *Bill Strong* thus held that the meaning of "claim" in FAR 31.205–33 is governed by the requirements of

the definition of a "claim" in FAR 33.201. As mentioned earlier, *see supra* notes 6 and 7, the current version of FAR 33.201 no longer includes the definition of "claim" and the pertinent provisions of the 1987 version of FAR 31.205–33(d) have been recodified in FAR 31.205–47. Still, the *Bill Strong* court's holding in this regard remains intact because FAR 31.205–47(f)(1) specifically references FAR 2.101, which contains the definition of "claim" previously found verbatim in FAR 33.201.

on *Plano* is misplaced. *Plano* involved consulting costs incurred in connection with the submission of claims certified according to the CDA. *Id.* at 636. The court in *Plano* found that "[t]he clear implication of the reference in FAR 31.205–47(f) to FAR 33.201 is that the contractor's submission of a claim pursuant to FAR 33.201 constitutes a part of the prosecution of the claim referred to in FAR 31.205–47(f)." *Id.* at 637–38. The *Plano* court is clearly correct on this point: If the document submitted to the CO is in fact a CDA claim, the physical act of submitting it no doubt constitutes part of the prosecution of a CDA claim. Yet this point, while correct, is irrelevant because without the necessary CDA certification, AEPCO's September 29, 2000 REA simply was not a CDA claim at the time of its submission.

Second, *Plano*'s discussion of *Bill Strong* is similarly unhelpful because, after *Reflectone,* despite the absence of a pre-existing dispute, the claim at issue in *Bill Strong* is properly considered an actual CDA claim. Therefore, the factual circumstances in *Bill Strong* now exemplify how "the filing of a CDA claim [can] *often* precede[ ] negotiations." *Plano,* 40 Fed. Cl. at 643 (emphasis added). In this respect, the court in *Plano* noted that

> [u]nder the CDA, interest does not begin to accrue on the government's monetary obligations until the contractor files a CDA claim. Hence, because the existence of a CDA claim no longer is dependent upon the existence of a dispute, a contractor typically will benefit financially from filing a CDA claim as soon as possible, even before the contracting officer initially assesses the merits of the claim. Therefore, after *Reflectone,* rather than constituting a phase distinct from the prosecution of a CDA claim, the exchange of information and negotiations between the contractor and the contracting officer are a natural part of the interactions between the parties *af-*

*ter submission of a CDA claim, i.e.,* negotiations are a reasonably expected part of a contractor's prosecution of a CDA claim.

*Id.* (emphasis added and internal citations omitted). This does not mean, as the Navy suggests, that negotiations can *never* constitute a phase separate from the prosecution of a CDA claim. The court's language in *Plano* simply reflects the sensible proposition that because negotiations between a contractor and the Government may occur before a dispute arises, and because a pre-existing dispute is no longer necessary for a CDA claim, negotiations can constitute part of the prosecution of a CDA claim when the contractor has, in fact, submitted a CDA claim. Because the Board's holding that the September 29, 2000 REA was not a CDA claim had nothing to do with the absence of a dispute between AEPCO and the Navy, *Plano*'s discussion of negotiations in this regard is irrelevant. While the filing of a CDA claim may *often* precede negotiations, it did not do so in this case. Indeed, the court in *Plano* itself allowed for just such a situation:

> This case does not raise, and hence the court need not address, a situation where a contractor employs a consultant's work product during good faith negotiations before filing a CDA claim and then, after the negotiations fail, relies upon that same work to show entitlement either at the time it submits a CDA claim or thereafter. In such a case, the consulting services not only would form the basis for and support a CDA claim, but also would facilitate pre-claim negotiations that potentially could have prevented the necessity of ever filing a CDA claim.

*Id.* at 643. Unlike *Plano,* this is a case where the consulting services served just such a dual function: first, by facilitating

pre-claim negotiations using the September 29, 2000 REA, and second, by partly forming the basis for submitting the updated CDA-certified April 30, 2001 REA. Indeed, the Board recognized this by concluding that "the costs incurred in updating the REA and converting the REA into a CDA claim subsequent to 2 October 2000 [were] costs incurred to promote the prosecution of a claim against the Government, and are therefore, unallowable." ASBCA Decision at 24. Therefore, the Board did not err in this case in examining the record on the course of negotiations between the parties to determine the objective purpose behind AEPCO's submission of the September 29, 2000 REA. *Bill Strong* remains good law on this point.

 From the record before it, the Board determined that the objective purpose of AEPCO's September 29, 2000 REA was to seek a comprehensive resolution of the entire job order. This is a finding of fact.[21] The Board's factual determinations are "final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b). If supported by substantial evidence, the Board's finding in this regard "must be affirmed, even though a reviewing court believes that substantial evidence also supports a contrary result." *Estep v. Richardson*, 459 F.2d 1015, 1017 (4th Cir.1972). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

In determining AEPCO's purpose in preparing and submitting the REA, the Board made note of the following evidence:

Even though the Government accepted Job Order No. 0072 on 30 April 2000, the parties continued to negotiate on the remaining unresolved sequences. Notwithstanding the fact that the CO believed he had settled 26 of the 29 sequences in July 2000, it is clear that, by that time, AEPCO began to focus on issues that affected the entire project such as constructive changes and impact. In early August 2000, AEPCO retained Willis as its consultant, to "help AEPCO prepare an REA on the Mount Whitney contract." It is undisputed that after AEPCO filed its 29 September 2000 REA on 2 October 2000, the parties continued to engage in settlement discussions for at least six more months until April 2001. It was not until negotiations with SUPSHIP reached an impasse in April 2001 that AEPCO by letter dated 6 April 2001 requested a final decision to "move the process of dispute resolution forward."

ASBCA Opinion at 23. It is therefore apparent that the Board found substantial evidence in the factual record to conclude that the preparation costs incurred in connection with the September 29, 2000 REA were correctly attributable to contract administration, not the prosecution of a CDA claim. While there may be evidence in the record that supports a contrary conclusion, it cannot be said that there is inadequate evidence in the record to support the Board's conclusion on this point.

In summary, therefore, the Board did not err in concluding that AEPCO's Sep-

---

**21.** That this finding was not listed in the Board's "Findings of Fact" is not dispositive. Determining what AEPCO's purpose was in preparing and submitting its September 29, 2000 REA is not a question of law. This determination is not made by reference to cases or legal treatises; rather, it is made by weighing the evidence, making credibility assessments and judgments about conflicting testimony or affidavits.

tember 29, 2000 REA was not a CDA claim. Moreover, because the Board did not rely on overruled precedent by applying the *Bill Strong* test to determine whether the September 29, 2000 REA preparation costs were related to contract administration, it did not err in considering record evidence of the course of dealings between the parties to determine the purpose behind AEPCO's September 29, 2000 REA submission, prior to the submission of the updated April 30, 2001 REA and the work related to the updating. Nor did the Board err when it relied on substantial record evidence to conclude that such preparation costs were allowable as costs incurred in connection with the effort to resolve the entire contract. The Board's finding in this regard was supported by substantial evidence in the record.

### III.

Accordingly, the Board's decision with respect to Count VI of AEPCO's complaint must be affirmed.

An appropriate order will issue.