**SAB CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–1952C.

United States Court of Federal Claims.

June 10, 2005.

James E. Keough, Pacific Grove, CA, for plaintiff.

Doris S. Finnerman, U.S. Department of Justice, Washington, DC, with whom were Peter D. Keisler, Assistant Attorney General and Director David M. Cohen, for defendant. John T. Lauro, U.S. Department of the Air Force, Arlington, VA, of counsel.

## OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

FIRESTONE, Judge.

Pending before the court are the parties' cross-motions for summary judgment. The

United States ("defendant" or "government") has moved for summary judgment on the issue of damages, arguing that none of the damages that the plaintiff, SAB Construction, Inc. ("plaintiff" or "SAB"), seeks are recoverable. The plaintiff has cross-moved for summary judgment on the issue of liability. After careful consideration of the briefs and two oral arguments, the government's motion for summary judgment is **GRANTED–IN–PART** and **DENIED–IN–PART**. The plaintiff's motion for summary judgment is **DENIED**.

## BACKGROUND

The following facts are not in dispute unless otherwise noted. The plaintiff is a corporation organized, doing business, and licensed as a general building contractor under the laws of California. Sue A. Bewley is the President and Chief Financial Officer of SAB. Jerry Bewley, her husband, is Secretary of SAB. SAB does not have an Asbestos Abatement Certification or Hazardous Substances Removal Certification from the California Contractor's State License Board. Asbestos and hazardous materials abatement are outside of its line of work.

On June 28, 1999, the United States Air Force awarded a contract to SAB for the renovation of the Visiting Airman's Quarters at Nellis Air Force Base ("Nellis AFB"), Nevada, in the amount of $1,734,583. The contract required SAB to "furnish all plant, labor, equipment, materials, transportation and all else necessary to perform all work to complete project number RKMF 94–0024, Repair VAQ. Building 536 at Nellis AFB, NV." Contract at 1. Jacquelyn Buky was the Contracting Officer who awarded the contract. At the time of the Preconstruction Conference, Jacquelyn Buky was designated as alternate contracting officer and John Stevens was designated as the primary contracting officer. John Stevens had participated in the design review process prior to the issuance of the solicitation.

When the solicitation was issued, on May 7, 1999, it contained paragraph 3.02(g) under the section "Building Demolition" of the specifications that required offerors to "[c]onform to the recommendations of the Asbestos and Lead Assessment Report included in Attachment A of these specifications." Black & Veatch, a contractor of the Army Corps of Engineers hired to complete a project design for the repair of the Visiting Airman's Quarters at Nellis AFB, had submitted an Asbestos and Lead Assessment Report as part of their design package, which also included the specifications for the project. The Asbestos and Lead Assessment Report was not included in the solicitation when it was issued.

The Asbestos and Lead Assessment Report concluded that "[t]he 12″x12″ vinyl floor tiles in the stairwells of the building were found to contain three percent asbestos"; "the white and red floor tile in the housekeeping offices were found to contain five and three percent asbestos respectively"; "the mastic on these tiles was also found to contain asbestos"; "mastic under the white floor tile contained seven percent asbestos"; and "mastic under the red tile contained five percent asbestos". Asbestos and Lead Assessment Report at 1–1. The Report further found that:

> [t]he two samples of mudded joint fittings taken from the hot water supply system tested positive for asbestos (ten and six percent). The total number of mudded joint fittings in the building is not known, due to their locations in celings and walls. The majority of the fittings observed in the course of the inspection of the building had their outer casings intact but were friable when the outer wrapping was damaged.

> The linear pipe insulation associated with the hot water system was sampled in four locations. Laboratory analysis found less than one percent asbestos content in three of the samples. The fourth sample had two layers, the first layer had less than one percent asbestos, the second layer was found to have three percent asbestos in laboratory analysis. This sample was taken from the piping running along the southern wall of the basement boiler room. . . .

Asbestos and Lead Assessment Report at 3–

2.[1]

The Asbestos and Lead Assessment Report contained recommendations regarding materials found to contain asbestos: "In their current conditions these materials may be left in place. If left in the building, these materials should not be sanded, ground, cut or otherwise abraded or rendered friable unless activities are conducted with all federal, state, and local regulations." Asbestos and Lead Assessment Report at 4–1.

The report also stated that, out of six paint samples, all but one, a sample from the first floor laundry room, were found to contain lead. The report recommended that "during renovation or demolition activities which will disturb the paint and potentially release lead dust within the building, proper action must be taken to protect workers in accordance with all federal, state, and local regulations. Additional testing may be necessary to determine proper disposal methods . . . ." Asbestos and Lead Assessment Report at 5–1.

During the design phase of the project, in October 1996, the Base Architect at Nellis AFB noted in his project review comments, "[c]heck cost estimate . . . asbestos and LBP should be added to estimate." Pl. Prop. Find. Uncontr. Fact ¶ 84.

Prior to issuance of the solicitation, on April 21, 1999, Jacquelyn Buky, the Contracting Officer, asked Albert Villano, the primary Project Engineer, "Have lead-based paint and asbestos survey been accomplished? If so, what are the results? If not, when will they be done?" On April 26, 1999, Albert Villano responded as follows:

> In response to your question regarding Lead Based Paint and asbestos survey:— LBP and asbestos has been accomplished. Based upon A & E's findings in concurrence with our EV personnel that 'The spackling compound on the wall systems in the building has tested positive for asbestos. However, when considered with the

volume of the compound is not sufficient to cause the entire system to be considered asbestos containing.' As far as the LBP, 'Six paint samples were taken from the building. No lead was detected in the paint sample.' Since there is no critical issue about asbestos and LBP, I did not feel that it is necessary to include removal of asbestos and LBP in the contract package.

Pl. Prop. Find. Uncontr. Fact ¶ 100; Pl. App. at 4.

A site visit for prospective bidders was held on May 27, 1999. On May 28, one of the prospective offerors asked that the Asbestos and Lead Assessment Report be released, or that the reference to it in the solicitation be deleted. On June 8, 1999, the solicitation was amended, changing paragraph 3.02(g) under "Building Demolition" to read: "A Lead–Based Paint (LBP) and Asbestos Survey have been accomplished. Asbestos was found in the spackling compound of the wall system, however, it is not sufficient to cause entire system to be considered asbestos containing material. No LBP was detected."

Some of the pages of the contract drawings submitted by Black & Veatch to the government contained a note that read, "REFER TO ASBESTOS AND LEAD BASED PAINT REPORT (ATTACHMENT 'A' OF SPECIFICATIONS) FOR LOCATIONS OF ASBESTOS CONTAINING MATERIALS AND LEAD BASED PAINT". This note was omitted from the same pages of the contract drawings furnished to SAB from the government. The contract drawings did bear Black & Veatch's name and logo. The signature block on the contract drawings for an environmental reviewer was left blank.

Prior to award, the government requested that SAB verify its bid, and SAB did so. SAB's Bid Estimate Breakdown reflected an estimate of $77,400 for "Site Work."

---

1. Materials are considered to be "asbestos containing materials" and thus subject to regulations under the Occupational Safety and Health Act when they contain more than one percent asbestos. 29 C.F.R. § 1926.1101(b) (2005). Thermal system insulation and surfacing material found in buildings constructed no later than 1980 are "presumed asbestos containing materials". *Id.* Presumed asbestos containing materials must be treated as asbestos containing unless it is determined that they do not contain more than one percent asbestos. 29 C.F.R. § 1926.1101(k)(1), (5).

Prior to demolition, SAB submitted a demolition plan to the government that did not contain special precautions for asbestos and lead based paint removal. The plan was approved by the Contracting Officer upon the recommendation of the Project Engineer. The government admits that it did not notify SAB or any prospective bidders of the presence, location, and quantity of asbestos containing material or presumed asbestos containing material, as required of building owners by 29 C.F.R. § 1926.1101(k)(2).

A Preconstruction Meeting was held on August 5, 1999. Albert Villano, the Project Engineer, Maureen Minshew, the Contract Administrator, Richard Lautenschlager, the Base Architect, and John Stevens, the Contracting Officer, were in attendance. The information on asbestos and lead, which was revealed to the government in the August 1996 Asbestos and Lead Assessment Report, was not identified during the Preconstruction Meeting as a potential problem.

The government issued the notice to proceed on September 20, 1999 and SAB commenced demolition the same day.

During the demolition phase of the contract, debris was transported in 44 dumpsters and deposited in the Apex Regional Landfill. A portion of this landfill is an Industrial Waste Landfill that accepts hazardous chemicals, asbestos, and regulated non-hazardous wastes. Under Nevada regulations, construction debris constitutes "industrial solid waste." SAB did not give Apex notice that it was depositing asbestos or lead-based paint. The debris contained at least some asbestos and lead-based paint.

On or about October 1, 1999, Jerry Bewley, SAB's project manager, approached Mike Feldt, the Air Force Inspector, about mechanical insulation that Bewley thought might be asbestos-containing material. Mr. Feldt told Mr. Bewley that asbestos was Albert Villano's responsibility. On October 29, 1999, John Stevens concluded that SAB's demolition work was complete. On November 3, 1999, SAB forwarded a letter to John Stevens that SAB had received from Clark County, Nevada, stating that it had not received all the information required to complete a dust permit application. Another

company, DGM, conducted an assessment of asbestos containing materials in the building on November 6, 1999. The survey was completed on November 8, 1999, identifying asbestos-containing materials in the building and recommending that a certified asbestos consultant be hired to abate the asbestos.

Neither SAB nor Jerry Bewley was aware of a problem concerning the presence of hazardous materials affecting SAB's work until November 8, 1999, when John Stevens, the Contracting Officer, directed SAB not to sweep the floor. On November 9, 1999, SAB requested an order to stop work. John Stevens issued a suspension of work order on November 10, 1999. SAB received a copy of the Asbestos and Lead Assessment Report prepared by Black & Veatch for the first time on November 23, 1999.

On November 10, 1999, through modification P0001, John Stevens directed SAB to hire a certified environmental contractor to perform abatement of the remaining asbestos and lead based paint in the building in accordance with the November 8, 1999 asbestos survey and to submit a cost proposal. SAB submitted a cost proposal on December 8, 1999 for $66,319.59 to abate the remaining asbestos and lead through a subcontractor. With its cost proposal, SAB submitted a document entitled "Reservation of Rights". On March 9, 2000, John Stevens issued unilateral modification P0002, revised from a bilateral to a unilateral modification, accepting SAB's cost proposal as submitted and increasing the contract price by $66,319.59. Stevens also sent SAB a letter stating that he did not agree with the provisions of SAB's "Reservation of Rights" and stating that "[s]hould you have any basis for the submission of a Request for Equitable Adjustment as implied by your 'Reservation of Rights' it will have to be developed in sufficient detail prior to submission of your final invoice and certified release of claims as required by the contract." Pl. Prop. Find. Uncontr. Fact ¶ 339; Pl.App. at 892–93. SAB's work on the contract was completed and accepted on June 19, 2000.

In an effort to put together a submission for a Request for Equitable Adjustment

("REA") under the contract, SAB hired consultants and an attorney to help estimate its potential liability to its workers and its subcontractors' workers for exposure to asbestos and lead. It also sought to estimate its liability for cleanup costs and penalties associated with the waste deposited at the Apex landfill. SAB carried Worker's Compensation policies from both California and Nevada. Jerry Bewley, as part owner of SAB, was expressly excluded from coverage under SAB's California worker's compensation policy. The workforce potentially exposed to asbestos and lead during demolition consisted of: five SAB employees hired in California, one of whom is an owner, and one of whom is deceased; seven SAB employees who were hired in Nevada; eleven Alta Construction employees, one of whom is an owner and one of whom is deceased; and six Solor Electric Nevada employees, one of whom is an owner.

Ten of SAB's employees were tested for levels of lead in the blood, and none of them had levels greater than forty micrograms per hundred grams. Dr. Timothy Deneau also found that there were "no medical conditions detected which place[d] the employee at increased risk of material impairment of health from exposure to lead and/or asbestos." Pl. Prop. Find. Uncontr. Fact ¶ 227. Dr. Deneau recommended that the employees have future periodic chest x-rays to monitor their medical status. On September 11, 2000, Employers Insurance Company of Nevada advised SAB that it would only pay for these initial tests, and would not pay for annual testing for the five Nevada employees who had been tested. The claims of these five employees for worker's compensation benefits were denied. Other than these worker's compensation claims, there have been no claims filed against SAB by any of its workers. It is not disputed that asbestos exposure-related diseases can manifest many years after exposure to the substance.

SAB initially hired the Kilbourne Company to estimate its potential liability for asbestos

exposure and bodily injury costs. The Kilbourne report concluded that the bodily injury costs associated with asbestos exposure would likely be $74,000. Thereafter, SAB hired another consultant, John Wojciak of the firm Risk International, to estimate SAB's potential liability for medical monitoring costs, compensation for injured workers, defense costs, and resolution costs for non-injured workers. Two actuaries from SIGMA Actuarial Consulting Group, Inc. reviewed Mr. Wojciak's report. The Risk International report estimated that SAB faced potential liability for its employees and its subcontractor employees, including defense costs and claims by uninjured workers, of nearly $12 million. SAB concedes that it did not rely on the Kilbourne Report in preparing its REA.

SAB also hired an engineer, Jack Cotter, to give his opinion as to SAB's liabilities regarding the landfill. Mr. Cotter's report states that representatives of the landfill were unable to provide information as to the depth and location of the wastes from Nellis AFB. The operator of the landfill also failed to identify the cell at the landfill into which the disposal had been made. Mr. Cotter produced a "worst case" cost estimate for excavating the landfill and for potential penalties associated with violating hazardous waste disposal regulations. The final report estimated that cleanup costs and penalties could exceed $24 million. Mr. Cotter further indicated in his report that SAB might not be liable, however, for any cleanup costs or penalties.

SAB hired all of its consultants subsequent to June 19, 2000. SAB incurred $10,295 in costs to Risk International. SAB incurred $4,200 for Mr. Cotter's reports, paid to Environmental Engineering Consultants. SAB incurred $13,600 in costs paid to the Kilbourne Company. SAB also incurred $40,986 in legal fees to Jolley Urga Wirth & Woodbury ("Jolley Urga") for legal advice.[2]

---

2. The legal fees have been further broken down to include $3,352 for legal advice associated with employee exposure issues and $1,867 for legal advice associated with the potential landfill liability. The government does not agree with

SAB's characterization of these services. The remaining legal fees were apparently incurred in connection with litigation SAB initiated against Black & Veatch.

SAB did not submit its final invoice and release of claims until June 12, 2001. John Stevens had been withholding $42,745.09 in final payment, awaiting the submission of the final invoice. On April 12, 2001, John Stevens sent a letter to SAB warning that the extended delay in submitting the invoice was not acceptable. SAB's release of claims submitted on June 12, 2001 excepted various claims in the amount of $82,065,266 for "asbestos adjustments."

SAB submitted a REA dated July 26, 2001 in the amount of $82,065,266. The REA included the amounts associated with potential liability for asbestos exposure, potential liability for cleaning up the landfill and for penalties, legal fees, and consultant costs. John Stevens denied the REA on November 28, 2001. In his denial, John Stevens stated that any restoration of the landfill "would be the responsibility of the generator, Nellis AFB, and not your firm." Pl. Prop. Find. Uncontr. Fact ¶ 363; Pl.App. at 217.

SAB instituted a suit against Black & Veatch in the District Court of Clark County, Nevada on September 26, 2001 based on Black & Veatch's apparent failure to include information on the presence of hazardous materials in its plans and specifications. The court dismissed the case based on the economic loss doctrine for the plaintiff's tort claim and for lack of privity on the contract claim. In addition, the court found that the contract between the government and Black & Veatch did not name SAB as a third party beneficiary. SAB appealed, and the case was settled while the appeal was pending. SAB has stated in its "Reservation of Rights" and its Request for Equitable Adjustment that it incurred $11,579 in costs to Jolley Urga for various items, including for prosecuting claims against Black & Veatch. In a letter to the government entitled "Updated Information," SAB stated that it had incurred additional costs for the litigation, for a total of $40,985.68. SAB sought this larger amount in its claim and demand for final decision.

SAB filed its certified Claim and Demand for Final Decision on August 16, 2002. SAB sought a total of $82,057,337, including $436,362 as the reasonable value of the demolition work it performed and reflecting a reduction in the amount of legal fees SAB was claiming. The contracting officer denied the claim on November 8, 2002.

The following issues and facts are in dispute. The government challenges the admissibility of the opinions of the consultants hired by SAB, as they have not been qualified as experts under Federal Rule of Evidence 702. The government disputes whether any government officials had knowledge of the presence of asbestos, and which government officials had such knowledge. The government also contends that there is no evidence demonstrating either the exact amount of asbestos and lead that was present in the building or the exposure level in the building. The government disputes whether SAB sanded and cut materials that had lead-based paint on them and whether SAB removed any floor tile. The government disagrees with SAB over the exact number of employee exposure hours or whether any workers were exposed to problematic levels of asbestos. The government also disputes whether SAB's suit against Black & Veatch was foreseeable and reasonable.

SAB brought this action on December 23, 2002. The government moved for summary judgment on the issue of damages on April 26, 2004. The plaintiff cross-moved for summary judgment on the issue of liability on June 14, 2004. Oral argument was held on December 6, 2004. Following court-requested supplemental briefs, a second telephonic oral argument was held on May 24, 2005.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505. Doubts as to factual issues must be resolved in favor of the non-moving party. *Mingus Constructors, Inc. v. United*

*States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). "On cross-motions for summary judgment, the court must evaluate each motion in its own right and resolve any reasonable inferences against the party whose motion is being considered." *Commercial Federal Corp. v. United States,* 55 Fed.Cl. 595, 615 (2003) (citing *First Federal Sav. Bank of Hegewisch v. United States,* 52 Fed.Cl. 774, 780 (2002)).

### B. The Government's Motion for Summary Judgment on Damages

As initially filed, the plaintiff's complaint contained claims for various equitable adjustments pursuant to contract clauses and claims for breach of contract damages, some of which have now been withdrawn. In particular, the plaintiff has withdrawn its claims for unjust enrichment based on an implied-in-law contract theory, *see* Apr. 15, 2004 Stipulation of Dismissal, for lost profits, *see* Dec. 6, 2004 Oral Arg. Tr. at 54, and for the potential liability SAB faces for worker exposure and landfill cleanup costs and penalties, *see* Dec. 6, 2004 Oral Arg. Tr. at 61–62.[3] Now, the plaintiff seeks the costs of self-insuring against the risk of worker exposure, landfill cleanup, or asbestos penalty liabilities, either as an equitable adjustment or as breach damages. In addition, the plaintiff seeks to recover the litigation expenses it incurred in prosecuting a claim against the design contractor, Black & Veatch, as breach damages ($35,766.50); the consultant fees it incurred in estimating its future liabilities for its "Reservation of Rights" and Request for Equitable Adjustment as either an equitable adjustment or as breach damages ($28,095); and the legal fees it incurred in determining what its legal liabilities might be ($5,219.50). The plaintiff also claims it is entitled to overhead and profit on these amounts. Finally, the plaintiff seeks to recover $436,362 as restitution pursuant to an implied-in-fact contract or to a reformed contract due to mutual or unilateral mistake.

The government argues that none of the damages claimed by the plaintiff are recoverable.

### 1. Costs of Self–Insurance

■ The plaintiff seeks to recover the cost of self-insuring against the risk of future liabilities for medical monitoring costs and potential tort claims by its employees. The plaintiff seeks these costs either as an equitable adjustment pursuant to a contract clause, or as damages for breach of contract. The government argues that these costs are not recoverable under either theory.

#### a. Equitable Adjustment Under the Contract

The government argues that the plaintiff may not recover the costs of self-insurance as an equitable adjustment pursuant to any contract clause. Because the plaintiff has not established a self-insurance program, and thus has not incurred a loss, the government contends that the plaintiff is not entitled to an equitable adjustment for losses it has not incurred.

The plaintiff argues that while it has not incurred any expenses, it has incurred the potential liabilities, which has impacted its bonding capacity and business. The plaintiff also argues that it is required to provide medical monitoring for its employees under the Occupational Safety and Health Act ("OSHA"). The plaintiff notes that such liabilities for self-insurance can be allocable to the contract under the Cost Accounting Standards. In such circumstances, the plaintiff argues, it is "self-insured" by default and thus has incurred a damage that may be reimbursed as an equitable adjustment.

The court agrees with the government. It is well-settled that "to prove that it is entitled to an equitable adjustment, a federal contractor must show liability, causation, and injury, and it must prove that the government somehow delayed, accelerated, aug-

---

**3.** At the December 6, 2004 oral argument the court and the plaintiff's counsel had the following exchange:

> THE COURT: Are you agreeing with the government that because you have not been sued and have incurred the liability for either work-

er exposure or cleanup cost exposure, that indeed those figures that were calculated are not recoverable, but that the only thing you're arguing now is [for the] cost of insuring against those claims?
> MR. KEOUGH: Yes.

mented, or complicated the work, and thereby caused the contractor to *incur specific additional costs*, and that those costs were reasonable, allowable, and allocable to the contract." 64 Am.Jur.2d *Public Works and Contracts* § 199 (2004) (emphasis added). "Once the contractor has proved the government's liability for the costs of added or changed contract work, the actual costs incurred by the contractor will provide the measure of the equitable adjustment to the contract price, if those incurred costs are reasonable." *George Sollitt Constr. Co. v. United States*, 64 Fed.Cl. 229, 245 (2005) (citing *Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516, 518–19 (1963)). "[T]he measure of an equitable adjustment is the 'difference between what it cost [the contractor] to do the work and what it would have cost [the contractor] if the unforeseen conditions had not been encountered.'" *Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 361 (1987) (quoting *Tobin Quarries, Inc. v. United States*, 114 Ct.Cl. 286, 334, 84 F.Supp. 1021 (1949)). Thus, an equitable adjustment reimburses the contractor for additional costs that it has incurred in performing the contract.

In this case, the plaintiff does not dispute that it has not purchased an additional insurance policy or set aside a self-insurance fund and thus it has not incurred any insurance costs. The plaintiff argues, however, that the cost of self-insuring has been incurred because the plaintiff faces a potential liability even if it has not incurred any additional costs of performing. In this case, the plaintiff now seeks the funds to create a self-insurance account to cover "liabilities" that have been "incurred" although it has not incurred any "damages".[4] The problem with the plaintiff's theory is that because the measure of an equitable adjustment is the *actual costs incurred* in performing the contract, this court cannot measure the equitable adjustment without incurred costs. Contrary to the plaintiff's assertions, an "incurred" potential liability is not an "incurred cost." The equitable adjustment is intended to cover the costs the contractor incurred in connection with the additional work associated with the change. The estimated cost of creating a self-insurance program is not an incurred cost.[5] Accordingly, the estimated cost of self-insurance is not recoverable as an equitable adjustment.

### b. Damages For Breach of Contract

■ The plaintiff's alternative theory for recovery is equally unsupported. The estimated costs of self-insuring are not recoverable as damages for breach of contract. One way in which courts remedy a breach of contract is by awarding damages based on the non-breaching party's expectation interest, or the "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a) (1981); *see also Glendale Federal Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) ("One way the law makes the non-breaching party whole is to give him the benefits he expected to re-

---

4. At the second oral argument on May 24, 2005, the plaintiff expressed an interest in establishing a trust fund with the court to hold funds in the event the plaintiff is found liable for any damages in the future. Where, as here, the government is involved in the same transaction that gives rise to the potential liability, the court sees no reason to hold funds. The government will be around to face any claims, should they arise, in the future.

5. The plaintiff's reliance on *Ryan–Walsh, Inc. v. United States*, 37 Fed.Cl. 639 (1997) is misplaced. *Ryan–Walsh* involved a contractor with an established self-insurance program to which the government was forced to contribute as part of an equitable adjustment. Here, the plaintiff does not have an established self-insurance program. Instead, the plaintiff is seeking to establish some type of insurance fund as a measure of its in-

creased costs of performing the contract. In contrast to *Ryan–Walsh*, self-insurance in this case was not an incurred cost.

The plaintiff's reliance on Cost Accounting Standard ("CAS") 416 is equally misplaced. The plaintiff contends that contractors can receive self-insurance costs from the government without actually incurring the costs. *See* 48 C.F.R. § 9904.416–40 (2005) (referring to "projected average loss"). Thus, the plaintiff contends that it should be able to obtain self-insurance funds as a contract administration cost without incurring them. The argument fails because this case does not involve an established and government-approved self-insurance program in which the government has agreed to pay self-insurance costs. CAS 416 is simply irrelevant to this case.

ceive had the breach not occurred."). "Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed.Cir. 2001). The plaintiff argues that, had the contract been fully performed, it would have known about the presence of asbestos and lead-based paint and would have taken precautions, and therefore would not be subject to the liabilities for which it has to self-insure.

The plaintiff argues that its need to self-insure was foreseeable to the government, was caused by the government's alleged breach, and is provable with reasonable certainty. The government argues that as a matter of law, under the facts of this case, the plaintiff cannot prove self-insurance damages with reasonable certainty and therefore SAB's claim must be rejected.

In a breach of contract case, "[a] claimant need not prove his damages with absolute certainty or mathematical exactitude . . . . Yet this leniency as to the actual mechanics of computation does not relieve the contractor of his essential burden of establishing the fundamental facts of liability, causation, and resultant injury." *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965). Again, such injury must be established with "reasonable certainty". *Id.* However, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960). Furthermore, "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Restatement (Second) of Contracts § 352 (1981). "Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and finan-

cial data, market surveys and analyses, business records of similar enterprises, and the like." *Id.* cmt. b.

In this case, it is undisputed that the plaintiff has not used its own funds to establish a self-insurance program. As noted above, the plaintiff has not incurred the loss of those funds. It is also not disputed that the plaintiff has not been subject to any claim by any worker allegedly exposed to asbestos or lead under SAB's contract. Nor does the plaintiff dispute that no employees will be able to recover damages from the plaintiff until they exhibit symptoms of disease. *See Metro–North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 432, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) ("[W]ith only a few exceptions, common-law courts have denied recovery to those who, like Buckley, are disease and symptom free."). It is further not disputed that the plaintiff has not paid for or arranged for its employees to have follow-up medical testing such as chest x-rays.

It is also undisputed that the plaintiff has not once in the nearly six years since performance of the contract received any indication from state or local government officials that it may be required to clean up a contaminated landfill or to pay penalties for improperly disposing of the asbestos. Moreover, in his denial of the plaintiff's REA, John Stevens indicated that the federal government would be responsible for any landfill cleanup. Finally, the plaintiff does not dispute that it carries worker's compensation and some general liability insurance.

Thus, although the plaintiff argues that it has incurred potential liabilities, it has not shown that it has any current obligations to pay any of the claims against which it seeks to self-insure. For example, in order for the plaintiff to accrue an obligation for worker exposure, several events must occur first: an employee who is not covered by worker's compensation [6] must have been exposed to friable asbestos or lead-based paint dust;

---

**6.** The government argues that for those workers who are covered by worker's compensation, that system is their exclusive remedy for injuries sustained on the job, including injuries from asbestos exposure. The plaintiff does not dispute this assertion, but claims that several employees, such as Jerry Bewley, who is also an owner of SAB, are not covered by worker's compensation and therefore would be able to pursue damages in a tort action against SAB. Thus, in order for the plaintiff to incur liability for worker exposure, it must be one of the few employees not covered by worker's compensation who manifests a disease and sues the plaintiff.

that employee must develop an asbestos or lead-based paint related disease; the employee must then sue the plaintiff; and the plaintiff must then be found liable for the employee's injury. In these circumstances, the plaintiff cannot establish more than a hypothetical possibility that it will be found liable for worker exposure or medical monitoring costs in the future.[7] Moreover, because the plaintiff carried worker's compensation and general liability insurance, the plaintiff cannot establish that if it is found liable, it will have to actually pay any damages.

Similarly, the plaintiff cannot establish that there is a reasonable probability that it will be liable for landfill cleanup costs and penalties. The plaintiff has received no indication from anyone that it is liable for those costs, although it has been nearly six years since completion of the contract. On the contrary, John Stevens has indicated that any landfill cleanup is the federal government's responsibility, not the plaintiff's.

For all of these reasons, the court agrees with the government that the plaintiff's claim for self-insurance is too remote and speculative to support any recovery, as a matter of law.[8] Although the plaintiff has gone to great pains to find a theory that will allow it to recover funds from the government now to protect it against potential future liabilities, unfortunately the court is unable to accept this theory. Recovery of the costs of self-insuring against future potential liabilities as

breach of contract damages would result in a windfall to the plaintiff. Without any evidence to show that the plaintiff now faces any actual liability, there is no basis for awarding damages.

### c. Claim for Future Liabilities Has Not Yet Accrued

Although the plaintiff cannot recover self-insurance costs under the contract or as breach of contract damages at this time, the court does not wish to foreclose the possibility of recovery in the future, if the liabilities the plaintiff is concerned about actually materialize.[9] This case presents a unique set of circumstances. Thus the court holds that if the plaintiff does incur liability for asbestos and lead exposure, for cleaning up the landfill, or for penalties sometime in the future, then the six year statute of limitations for breach of contract actions in this court will run from that date and not from the breach. *See* 28 U.S.C. § 2501 (2005).

Although a claim for breach of contract ordinarily accrues, and the statute of limitations begins to run, at the time of the breach, *see, e.g., Brighton Village Associates v. United States,* 52 F.3d 1056, 1060 (Fed.Cir.1995), this is not always the case: "It is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages." *Terteling v. United States,* 167 Ct.Cl. 331, 334 F.2d 250, 254 (1964). Therefore, in *Terteling,* the

---

7. The plaintiff did not establish that it had any present liability for conducting medical monitoring of its exposed workers.

8. Because the court concludes, as a matter of law, that plaintiff's claim for damages is too speculative, it does not reach the issue of whether, in a case where the damages are not too speculative, the cost of insurance would be the proper measure of damages.

9. In this connection, the court notes that, although contractual indemnification may not be implied in fact against the United States, *see Hercules, Inc. v. United States,* 516 U.S. 417, 426–429, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996), contribution is generally available from the government under the Federal Tort Claims Act. *United States v. Yellow Cab Co.,* 340 U.S. 543, 548, 71 S.Ct. 399, 95 L.Ed. 523 (1951). Furthermore, the statute of limitations on a claim for contribution does not begin to run until a judgment is paid. *See id.* at 552, 71 S.Ct. 399. Thus, at least

with regard to the plaintiff's potential liability for worker exposure, if the plaintiff is sued by its employees in the future and the plaintiff is able to demonstrate that the government breached a duty owed to the plaintiff's employees (such as, for example, a duty owed under OSHA), then it seems that the plaintiff might be able to seek contribution from the government as a joint tortfeasor, whether by impleading the government as a third party or by bringing a separate action for contribution. *Id.* at 553, 71 S.Ct. 399. Of course, in either case, such an action must be brought in U.S. District Court, as this court does not have subject matter jurisdiction over claims sounding in tort. 28 U.S.C. §§ 1346(b), 1491(a)(1); *see, e.g., Brown v. United States,* 105 F.3d 621, 623 (Fed.Cir.1997) (holding that the plaintiffs' fraud claims sounded in tort and thus the Court of Federal Claims did not have jurisdiction over them).

"contractors had the right to wait until their full obligations were ascertainable before bringing suit therefor." *Id.* at 255. "A claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Kinsey v. United States,* 852 F.2d 556, 557 (Fed.Cir. 1988) (quoting *Oceanic Steamship Co. v. United States,* 165 Ct.Cl. 217, 225 (1964)). A "breach of contract claim accrue[s] when [the plaintiff] should have known that it had been damaged by the government's breach." *Ariadne Fin. Servs. Pty. Ltd. v. United States,* 133 F.3d 874, 878 (Fed.Cir.1998). It is perhaps more common that the plaintiff is damaged at the time of breach, but in some circumstances, such as those in this case, the plaintiff may not be damaged until much later. In such a case, the claim for breach of contract will not accrue for statute of limitations purposes until the damages are incurred.

In addition, the Federal Acquisition Regulations ("FAR") provide that a claim does not accrue until all events that fix the liability of the government occur. 48 C.F.R. § 33.201 (2005). "For liability to be fixed, some injury must have occurred." *Id.* The regulations further provide that "[c]ontractor claims shall be submitted, in writing, to the contracting officer for a decision within 6 years after accrual of a claim." 48 C.F.R. § 33.206. Thus there should be no barrier to the plaintiff bringing an action in the future.

Accordingly, the statute of limitations for the plaintiff's claims based on exposure to asbestos and lead and for cleanup costs and penalties will not begin to run until damages or injuries arise.

### 2. Litigation Expenses

■ The plaintiff also seeks the litigation expenses it incurred in prosecuting a claim against Black & Veatch, the project's design contractor, as damages for breach of contract. The plaintiff argues that the nature of the government's breach mislead the plaintiff into believing that Black & Veatch, rather than the government, had breached a contractual or tort duty, causing the plaintiff to file suit against Black & Veatch. Again, the government argues that these damages are unrecoverable, and again, the court agrees.

In order to recover a damage, "there must be no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably." *Myerle v. United States,* 33 Ct.Cl. 1, 26, 1800 WL 2024 (1897). With regard to attorney fees, it has been noted that "[counsel fees are] the kind of consequential damages not normally awarded in contract breach cases. Courts do not, in awarding breach damages, follow through the remote indirect consequences of the breach as distinguished from those directly in contemplation when the contract was made." *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 269 (1981),[10] *cited with approval in Hercules, Inc. v. United States,* 24 F.3d 188, 200 (Fed.Cir.1994); *Texas Instruments, Inc. v. United States,* 991 F.2d 760, 764–65 (Fed.Cir.1993). More recently, the Federal Circuit has held that "the causal connection between the breach and the [damages] must be 'definitely established'.... The standard ... ensures that the non-breaching party will not be awarded more than it would have received if the contract had been performed." *California Federal Bank v. United States,* 395 F.3d 1263, 1268 (Fed.Cir.2005) (citations omitted). Thus, the plaintiff may recover "those losses that would not have occurred but for the breach". *Id.*

---

10. At issue in *Kania* was the plaintiff's claim for money damages for breach of an immunity agreement between the plaintiff and the prosecutor in a criminal case. After concluding that such an agreement was not sufficient to confer Tucker Act jurisdiction on the court, the Court of Claims stated in dicta that jurisdiction to award attorney fees as an element of breach damages, as distinguished from an award of attorney fees "as such", would be "dubious". 650 F.2d at 264. Subsequent cases in the Court of Claims and Federal Circuit have not clearly settled the issue of whether litigation expenses, as an element of breach damages, are unrecoverable as a matter of law. *See Pratt v. United States,* 50 Fed.Cl. 469, 482–83 (2001) (discussing *Kania*). Accordingly, this court is analyzing the plaintiff's claim for litigation expenses as it would any other claim for breach of contract damages.

Although causation is a question of fact, *Bluebonnet*, 266 F.3d at 1356, in this case the facts material to causation are not in dispute. The plaintiff filed a suit in state court against Black & Veatch for that firm's alleged breaches of tort and contractual duties that were completely separate from the government's duties under its contract with the plaintiff. It was the plaintiff's decision to bring such a suit. Although the plaintiff may be correct that "but-for" the government's alleged breach of its contract with the plaintiff the plaintiff would not have been presented with the decision whether to bring suit against Black & Veatch or the plaintiff would not have thought it had a claim against Black & Veatch, this theory of causation is too broad. The decision to bring the suit, and to incur the costs, rested with the plaintiff. The plaintiff's decision breaks the chain of causation between the government's alleged breach and the litigation because the litigation did not flow "inevitably and naturally" from the government's alleged breach.

Furthermore, the plaintiff's claims against Black & Veatch existed independently of the government's alleged breach; they did not arise directly from the government's breach. The plaintiff's litigation against Black & Veatch is distinguishable from litigation that the plaintiff might have to defend because of the government's alleged breach. In the situation where the party has to defend a third party claim, the third party's injury, and the basis for its suit, arises directly out of the government's alleged breach. The plaintiff's injury here, litigation expenses, do not arise directly out of the government's alleged breach because the plaintiff's claims against Black & Veatch for breaches of Black & Veatch's duties exist whether or not the government breached a contract with the plaintiff. Therefore, once again, it cannot be said that the plaintiff's litigation expenses flowed "inevitably and naturally" from the government's alleged breach, or that the plaintiff would not have incurred those expenses "but for" the alleged breach.

Furthermore, the plaintiff's argument that its litigation expenses were incurred in an attempt to mitigate the damages for which the government would be liable is irrelevant. While the argument attempts to show that the government benefitted from the litigation, and thus the government should be liable for the costs of the litigation, the argument does not address the problem of causation.

Similarly, the plaintiff's reliance on *Terteling* is misplaced. In that case, the plaintiffs' contract to build an air base indicated that a gravel pit site would be furnished by the government "without cost to the contractors". 334 F.2d at 256. The government furnished gravel pit sites that were located on private lands without permission from the landowners, and the plaintiffs removed gravel from those sites. The plaintiffs were sued by the landowners after performance of the contract was complete, and the plaintiffs incurred litigation expenses, for which the Court of Claims then held the government liable: "When the government did not defend [the suit], and the plaintiffs were forced to defend, we think the government breached its contract to furnish the gravel pit sites without cost to the contractors." 334 F.2d at 256. Thus, in that case, the incurrence of the litigation costs was itself the breach of the contract; in such circumstances there could be no intervening cause between the breach and the damage. The present case is distinguishable. Here the plaintiff affirmatively undertook litigation for its own benefit; the plaintiff's action against Black & Veatch did not arise because of the government's failure to take action against Black & Veatch.

In sum, the plaintiff has failed to establish any basis for claiming the legal costs it incurred in suing Black & Veatch. Those costs are not recoverable in this action, as a matter of law.[11]

### 3. Consultant Costs

▇ The plaintiff also seeks to recover the amounts it paid its consultants to estimate its liability for worker exposure and landfill

---

11. Because the court finds that the plaintiff has not established causation, and thus cannot recover its litigation expenses on that ground, the court does not reach the question of whether the plaintiff's litigation expenses are also unrecoverable on foreseeability grounds.

cleanup and penalties, and the legal fees paid to Jolley Urga to advise on its legal liability and to help it prepare a notification letter to its employees. The plaintiff also seeks General and Administrative costs ("G & A") and 9% profit on these amounts. The plaintiff argues that it used the estimates and advice in preparing its "Reservation of Rights", which was submitted with its cost proposal for the contract modification, and its subsequent Request for an Equitable Adjustment. The plaintiff also argues that these consultant costs are allowable under the cost principles as economic planning costs. The plaintiff argues that such uses qualify these costs as allowable contract administration costs under the contract.

The government argues that the plaintiff's consultant costs are unallowable under 48 C.F.R. § 31.205–47(f)(1), which states that the costs of legal services and the services of consultants are "unallowable if incurred in connection with ... the prosecution of claims or appeals against the Federal Government." The government argues that the amounts that the plaintiff paid to three consultants and a law firm were for services used in preparing its claim for additional costs and that these services provided no benefit to the government, and thus are unallowable under the contract. The government also argues that even if the plaintiff's consultant costs are allowable, the plaintiff is not entitled to general and administrative costs and profit on those amounts.

The court agrees with the plaintiff that its consultant costs are potentially allowable under the contract. When the Contracting Officer makes a change to the contract that "causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, ... the Contracting Officer shall make an equitable adjustment and modify the contract in writing." 48 C.F.R. § 52.243–4 (Aug.1987). The plaintiff's contract contained a clause stating "[w]hen costs are a factor in any price adjustment under this contract, the contract cost principles and

procedures in FAR Part 31 and [Department of Defense Federal Acquisition Regulation Supplement ("DFARS")] Part 231, in effect on the date of this contract, apply." [12] DFARS § 252.243–7001 (Dec.1991). The cost principles state that "[c]osts shall be allowed to the extent they are reasonable, allocable, and determined to be allowable under 31.201, 31.202, 31.203, and 31.205." 48 C.F.R. § 31.204(a). "Costs of professional and consultant services are allowable ... when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government [subject to 48 C.F.R. § 31.205–47]." 48 C.F.R. § 31.205–33(b).

The Federal Circuit has noted that there are "three distinct categories" of legal and consultant costs in the cost principles: "(1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract; and (3) costs incurred in connection with the prosecution of a [Contract Disputes Act, 41 U.S.C. §§ 601–613 (2005) ("CDA")] claim." *Bill Strong Enterprises, Inc. v. Shannon*, 49 F.3d 1541, 1549 (Fed.Cir.1995), *overruled in part by Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1579 (Fed.Cir.1995) (en banc) (holding that a CDA claim does not have to be in dispute in order to constitute a "claim" under what is now 48 C.F.R. § 31.205–47(f)(1)). Costs incurred in connection with the prosecution of a CDA claim are per se unallowable under 48 C.F.R. 31.205–47(f)(1). *Bill Strong*, 49 F.3d at 1549. If the contractor seeks more than $100,000, then it must certify the claim pursuant to 48 C.F.R. § 33.207 in order to qualify it as a CDA claim. There is a "strong legal presumption" that costs incurred prior to submission of a CDA claim are allowable. *Bill Strong*, 49 F.3d at 1551.

However, even if the cost is not per se unallowable, the court must still determine whether a legal or consultant cost provides a "[b]enefit to the contract purpose, whether in its work performance or administration". *Bill Strong*, 49 F.3d at 1549.

---

12. To the extent the government argues that the cost principles, such as the allowability of economic planning costs under 48 C.F.R. § 31.205– 12, are only applicable to cost reimbursement contracts, this argument is rejected. *See* Def. Opp. Pl. Cross–Mot. at 32.

If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost .... On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the government, then such cost is unallowable ....

*Id.* at 1550.

In keeping with *Bill Strong,* the cost of preparing an REA has in some cases been allowed as a cost incurred for the purpose of furthering the negotiation process. *See Johnson v. Advanced Eng'g & Planning Corp.,* 292 F.Supp.2d 846 (E.D.Va.2003) (allowing the costs of preparing an REA); *American Mechanical, Inc.,* ASBCA No. 52033, 03–1 BCA ¶ 32134, 2002 WL 31886895 (Dec. 20, 2002) (allowing the costs of preparing an REA where the parties were in the process of exchanging correspondence and information); *Propellex Corp.,* ASBCA No. 50203, 02–1 BCA ¶ 31721, 2001 WL 1678757 (Dec. 27, 2001) (allowing the costs of preparing an REA where the Contracting Officer made a subsequent settlement offer), *aff'd,* 342 F.3d 1335 (Fed.Cir.2003).

Here, the government issued a formal change order, the modification to the contract, requiring the plaintiff to conduct asbestos abatement. The plaintiff submitted a cost proposal for certain increased costs associated with the change, and submitted a "Reservation of Rights" reserving its right to claim other costs relating to estimated potential liabilities in the future. The Contracting Officer accepted the cost proposal, but suggested that the plaintiff submit an REA "developed in sufficient detail" because he could not agree to the "Reservation of Rights". In response the plaintiff hired experts to evaluate its potential costs. The Contracting Officer rejected the plaintiff's REA, and in doing so he went through each of the costs estimated by the plaintiff's consultants. After the REA was rejected, the plaintiff filed its certified Claim and Demand for Final Decision, its CDA claim, on August 16, 2002.

This course of events demonstrates that the parties were in the process of negotiating the amount of the plaintiff's equitable adjustment for the government's unilateral change. The parties exchanged correspondence and information, prior to the plaintiff's submission of a CDA claim, in which John Stevens indicated that he needed more detailed information in order to evaluate the plaintiff's claims. This exchange culminated in the Contracting Officer's review of the plaintiff's proposed cost estimates and decision not to accept them. While the Contracting Officer did not accept the estimates, it is clear that the cost estimates were considered and were part of a negotiation process. The use of consultant reports, as part of the process of preparing the REA, may be a benefit to the contract. Therefore, to the extent the plaintiff's consultant costs were used to estimate liabilities to be included in the REA and were considered by the Contracting Officer in evaluating the REA, they are allowable as contract administration costs pursuant to 48 C.F.R. § 31.205–33(b).[13]

Although the court finds that the plaintiff's consultant costs are allowable costs of administering the contract as modified, the court cannot determine at this time whether all of the costs incurred were reasonable and allocable to the contract because there appear to be facts in dispute regarding the extent to which certain legal-consultant services were used to prepare a claim against the government.[14] Thus, further proceedings are required to determine the amount of costs for consultant services, including legal services, that the plaintiff is entitled to recover.[15]

---

13. In this connection, the court notes that SAB concedes that it did not rely on the Kilbourne report to support its REA; as such, the costs associated with this report are not recoverable.

14. For example, the government has argued that at least part of the legal services rendered were used in determining whether and to what extent the plaintiff had legal claims against the government.

15. The court, however, notes that to the extent that costs are allowed, the plaintiff will be entitled to a reasonable profit on such costs. *See Propellex Corp.,* ASBCA No. 50203, 02–1 BCA ¶ 31,721, 2001 WL 1678757 (Dec. 27, 2001), *aff'd,* 342 F.3d 1335 (Fed.Cir.2003).

#### 4. Restitution

■ The plaintiff finally seeks $436,362 as restitution for the reasonable value of the services it provided to the government under an implied-in-fact contract theory, or based on a theory of reformation for mutual mistake. The plaintiff argues that the measure of restitution is the value of the benefit the government received. Here, the government would have had to pay $436,362 more if it had paid for asbestos abatement; therefore the plaintiff contends it is entitled to that amount because asbestos was removed, saving the government the amount it would have paid for abatement.

The government argues that the $436,362 the plaintiff claims as the reasonable value of its services to the government is not recoverable. In particular, the government argues that the proper measure of restitution is the reasonable value of the services that have in fact been rendered, not the amount of money the alleged breaching party saved by breaching the contract. The government also argues that restitution is not available when the plaintiff has performed all of its duties under the express contract.

The court agrees with the government. Although it has been held that restitution may be measured by the "value of the benefits received by the defendant due to the plaintiff's performance," *Landmark Land Co. v. FDIC,* 256 F.3d 1365, 1372 (Fed.Cir.2001), "the objective [of restitution] is to restore the parties to the status quo ante." *Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001). Restitution "requires determining what benefit from the contract the breaching party has received, and restoring that to the nonbreaching party." *Id.* at 1381. Thus, "restitution would make use of calculations from fixed events in the past ...." *First Nationwide Bank v. United States,* 51 Fed.Cl. 762, 765 (2002) (comparing the calculation of restitution to the hypothetical expectancy calculation). Therefore, restitution is measured by the reasonable value of the services actually rendered, not the value of the government's hypothetical savings due to the breach.

Here, it is undisputed that the plaintiff rendered demolition services without special asbestos abatement procedures up until work on the contract was suspended. It is also undisputed that the plaintiff was paid for these services pursuant to an express contract. Except for the portion of the work performed under the unilateral change order, the government did not receive asbestos and lead abatement services from the plaintiff. The government received the services for which it had contracted with SAB. SAB did not incur any additional costs in removing the asbestos or lead-based paint. There is nothing for the court to restore to SAB, and thus paying SAB for services it did not perform would result in a windfall. Accordingly, restitution damages based on the value of asbestos abatement services that were not performed by SAB are not recoverable.

#### C. The Plaintiff's Motion for Summary Judgment on Liability

Because the plaintiff's consultant costs are the only damages potentially recoverable in this case and because such costs are potentially allowable under the changes clause of the contract, the plaintiff's other theories of liability are not relevant to this remaining claim. The plaintiff's arguments regarding liability based on contract clauses, such as differing site conditions, breach of contract theories, such as nondisclosure of superior knowledge, and implied-in-fact contract theories are now moot. Accordingly, summary judgment on the issue of liability is moot and the plaintiff's motion must be denied.

#### CONCLUSION

For the foregoing reasons, the government's motion for summary judgment is **GRANTED–IN–PART** and **DENIED–IN–PART**. The plaintiff's motion for summary judgment is **DENIED**. The parties shall file a joint status report by July 6, 2005 outlining the next steps for resolving this litigation. Given the small amount remaining in dispute, the court urges the parties to find an amicable resolution.

**IT IS SO ORDERED.**